**BROOKS TOWERS CORPORATION et al., Plaintiffs-Appellants and Cross-Appellees,**

v.

**The HUNKIN-CONKEY CONSTRUCTION COMPANY and Federal Insurance Company, Defendants-Appellees and Cross-Appellants.**

**Nos. 71–1094, 71–1095.**

United States Court of Appeals, Tenth Circuit.

Feb. 1, 1972.

**1204**

Geoffrey M. Kalmus, New York City (Nickerson, Kramer, Lowenstein, Nessen & Kamin, New York City; Gorsuch, Kir-gis, Campbell, Walker & Grover, Denver, Colo., on the brief), for plaintiffs-appellants and cross-appellees.

Warren O. Martin, Denver, Colo. (Berge, Martin & Clark, Denver, Colo., on the brief), for defendants-appellees and cross-appellants.

Before PICKETT, HILL and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

This appeal is taken by Brooks Towers Corporation, hereinafter called the Owner, and its co-plaintiffs, Central Bank and Trust Company and the First National Bank of Denver, lending institutions, from the $786,386.24 judgment awarded the Hunkin-Conkey Construction Company and Federal Insurance Company, hereinafter called the Contractor, upon its counterclaim for damages representing the balance due under a contract for the construction of Brooks Towers, a 42-story commercial and apartment building in Denver. The Contractor has filed a cross-appeal.

This diversity suit involved a two-week trial to the Court without jury.

### The Contract—Contentions—Court Findings

The original construction contract price was $7,600,000.00. Pertinent provisions, for purposes of this opinion, became operative on June 8, 1966, when work commenced. They are:

"Within fifteen months after acceptance (June 8, 1966) of said notice to proceed

"(a) commercial and office space is to be substantially completed as a shell area and be ready for customization by others in accordance with plans and specifications,

"(b) garage floor areas shall be substantially completed with 20% of said garage area being reserved for Contractor storage and usage,

"(c) approximately 175 apartment suites on a contiguous block of lower floors shall be substantially completed and ready for final decoration by others,

"Substantial completion of the entire Work shall be accomplished in eighteen (18) months after acceptance of said notice to proceed."

Substantial completion was defined as meaning "when the Work is ready for occupancy for its intended purposes, except for customization for tenants and 'punch list' items to be completed by Contractor." By its terms, unless relieved by excusable delays, substantial completion should have been accomplished by December 8, 1967. The Contract provided further that:

"If the Contractor is delayed at any time in the progress of the Work by any act or neglect of the Owner, the Architect, or any employee, agent or contractor of either, or by deletions, alterations, or additions ordered in the Work, or by labor disputes, fire, accidents, severe weather conditions, unusual delay in transportation or any other causes beyond the Contractor's control, then the times herein fixed for the completion of the Work shall be extended for a period equivalent to the time lost by reason of any one of the causes aforesaid. *The Contractor shall promptly notify the Owner in writing of the facts relating to any of the above described causes of delay and Contractor's estimate of the revised dates of completion of the Work.*" (Emphasis ours.)

The Owner contends that it is entitled to damages by reason of failure of the Contractor to meet either the partial completion or substantial completion dates in the contract schedule. It contends that the building was not completed until November of 1968. The Owner seeks damages for lost rentals, additional interest payments charged, defective work, temporary housing of tenants and other losses.

The Contractor counterclaimed, alleging that by reason of excusable delays the building was substantially completed on June 1, 1968. The Contractor sought a total judgment of $1,029,947.93.

The trial court found that: (1) the Owner, at pretrial, asserted that the Contractor was required to complete the building in December, 1967, and that it was not completed until November, 1968; (2) the parties agreed upon a procedure with respect to changes in the work (deletions, alterations, or additions) which involved, in each instance, a "Quotation" from the Contractor setting forth the number of additional calendar days to be extended beyond the original Contract period for completion of the work, directed to the Owner's Architect, who approved extensions of time totalling 185 calendar days; (3) in addition to the extensions of time approved by the Owner's Architect, the Contractor was entitled to 30 calendar days by reason of labor disputes and severe weather conditions; and (4) that substantial completion of the work occurred on June 8, 1968, except for noncustomized apartment units on floors 40 and 41 which were not completed until October 11, 1968, but that the Owner did not offer evidence of any loss of rental damage thereby. The Court had previously ruled that the Owner was entitled to a set-off of $28,170.00 representing the measure of damages for failure of the Contractor to comply with Bulletin 15 relating to work to be performed on concrete balconies.

### Partial and Substantial Completion

The Owner complains that the trial court erred in failing to make any findings relating to "partial completion", i. e., the occupancy aimed for within the 15 month period. The parties understood that both the "partial" and "substantial" completion schedules were extremely tight and that the construction schedule required clockwork precision in order to accomplish these objectives. These schedules were strictly tied to the original plans and specifications.

Max Ratner, the Owner's Architect, acknowledged that major changes were made from the original plans and specifications, with particular reference to the third floor and the upper floors. These changes affected both structural and mechanical engineering changes.

Ratner acknowledged that many of the changes affected the sequence of the work, thus creating delays. The Contractor had undertaken a "critical path scheduling" study before submitting its bid on this project. This involves breaking a construction job down into its smallest working components and scheduling the work in proper sequences. The importance of meeting a "critical path schedule" is evident. Chat Paterson, Vice-President of the Owner, testified that the Owner, too, relied upon its own critical path schedule.

There is substantial evidence in this voluminous record that: (a) "partial completion" was accomplished through the 20th floor by December 11, 1967, some three months behind the contract schedule; (b) the major change relating to the third floor had occurred during this time; and (c) the Contractor had requested some 78 days extension of time, relating entirely to changes in the scope of the work which, together with delays during the first 15 months resulting from strikes and weather conditions, are justified in this record.

■ The trial court properly treated and considered damages only in relation to the "substantial completion" covenants of the Contract. The Court found that substantial completion was not required of the Contractor until July 1, 1968. We hold that this finding is supported by substantial evidence.

### Extensions of Time

The overriding dispute in this case involves the extensions of time which the Contractor was entitled to. The trial court found that the Owner's Architect, Ratner, had approved extensions of 185 days, exclusive of 30 days delay resulting from labor disputes and severe weather conditions—or a total of some 215 days extension.

The Owner contends that the Contractor was not entitled to any extensions of time beyond some 30 days resulting from labor disputes and severe weather conditions. In justification, the Owner ar-

gues that: (a) the extensions requested were for customization work, the accomplishment of which was not germane to substantial completion; (b) this customization work, for the most part, was not performed until after the date on which the Court found that substantial completion had occurred; and (c) the extensions of time were understood by the parties to be concurrent and not tacked onto one another.

We first observe that all references in the Contract referred to as "customization" work were those in the *original* plans and specifications, not customization work resulting from changes effected after the Contract was executed.

There is a most damaging vacuum in this record reflecting upon the Owner. The Owner contends that its Architect, Max Ratner, had no authority to grant extensions of time. Pointing to the Contract language designating the Architect as the Owner's agent to "review and act" in an advisory capacity for the Owner relating to construction changes, the Owner disavows the Architect's authority to grant extensions of time. Thus, the Owner argues that the Contractor did not notify the Owner of claims for additional time except for some 30 days delay resulting from strikes and severe weather conditions.

### Extension of Time Procedure

The parties effected a specific procedure for Change Orders from the original plans and specifications. The Owner's Architect issued a "Bulletin" detailing a change directed to the Contractor requesting a "Quotation" from the Contractor. This was, in legal effect, a call for a bid. The Contractor would then issue a "Quotation" setting forth a change in Contract price, if any, together with a specific request for additional days to complete the Contract as a result of the changes. The record reflects that the Contractor requested extensions of some 300 days involving about 80 formal "Quotations" and some 30 Field Order Changes. The "Quotations" were, in legal effect, offers on

the part of the Contractor to undertake the requested changes, subject to specific price changes, if any, and additional days to complete the work. These "Quotations" were submitted direcly to Ratner, the Architect, and reviewed by Chat Paterson, Vice-President of the Owner, and one Kromer, an on-the-job architect employed by Ratner. Kromer testified that he and Ratner jointly agreed on each Quotation. He and Ratner both testified that they were in a position only to recommend extensions to the Owner, but that the ultimate determination was between the Owner and the Contractor. But Ratner also said that the decisions on the Quotations would be made by the Owner and "ratified" by him. Herbert Wasserman, an officer of the Owner, testified that he was in "constant" contact with Ratner and Paterson concerning contract price changes and that he did review some Quotations. The Quotation forms were prepared by the Contractor. Each contained a portion for approval or disapproval for execution by the Owner, as follows:

## APPROVAL

The undersigned hereby approves the above proposal for Item(s) ——————— above for a total net increase/decrease/no change in the contract price of ——————— Dollars ($———————). Item(s) (of calendar days) above are not approved. You are requested to prepare an amendment of the Agreement dated May 5, 1966 in accordance with the foregoing.

MAX RATNER, ARCHITECT

By ———————————————

Dated ———————————————

In every instance Ratner completed that portion of the Approval dealing with the change in contract price. In a few instances Ratner expressly allowed or disallowed extensions of time. In the great majority of the Quotations Ratner did not make any entries relating to extensions. He testified that by not acting, he indicated his disapproval, or, perhaps more accurately, that the extensions were matters to be determined by the Owner and the Contractor. The Contractor relied upon the lack of express disapproval as a grant of the requests for extensions. After Ratner returned the "Quotation" forms to the Contractor, an amendment or "Change Order" reflecting the deletions, alterations or additions was prepared by the Contractor and thereafter executed by the Contractor. Paterson then executed on behalf of the Owner. The two interim Denver lending banks also executed them. The "Change Orders" did not refer to extensions of time.

■ The trial court found that Ratner was authorized by the Owner to act as its architect and agent in supervising the work, in issuing the Bulletins for changes, and in approving or disapproving the Quotations including the extensions of time. The trial court found that the extensions of time approved by Ratner totalled 185 calendar days. We agree.

■ Lacking express disapproval as contemplated on the face of the form, the Contractor relied upon Ratner's inaction as approval. Here the silence can be attributed to both Ratner and Paterson, the Owner's representatives on the job. When the relations between the parties justify the offeror's expectation of a reply or where a duty exists to communicate either an acceptance or rejection, silence will be regarded as an acceptance. Laredo Nat. Bank v. Gordon, 61 F.2d 906 (5th Cir. 1932); Suitter v. Thompson, 225 Or. 614, 358 P.2d 267 (1960); Tanenbaum Textile Co. v. Schlanger, 287 N.Y. 400, 40 N.E.2d 225 (1942); and Lechler v. Montana Life Ins. Co. of Helena, Mont., 48 N.D. 644, 186 N.W. 271 (1921).

■ We do not find any inconsistency on the part of the Contractor in directing requests for extensions of time resulting from labor disputes and severe weather conditions to the Owner's Denver office rather than to the Architect. These requests did not relate to deletions, alterations or additions in the building plans and specifications.

■ The procedure established by the parties constituted confirmation by the Owner of the authority exercised by Ratner and Paterson. Rogers v. Beiderwell, 175 Kan. 223, 262 P.2d 814 (1953); Davis v. Bush & Lane Piano Co., 124 Or. 585, 265 P. 417 (1928); Sando v. Kalberg, 138 Wash. 247, 244 P. 576 (1926); Blackwell v. Kercheval, 27 Idaho 537, 149 P. 1060 (1915).

### Customization

The Owner insists that of the 185 days of extensions allowed by the Court based upon Change Orders, all but 43 days dealt with "customization" work only. Applying Article 2 of the Contract, the Owner thus argues that substantial completion of the work should have been accomplished on or about February 24, 1968.

It is true that a great deal of the work changes related to "customization". It is also true that many of the Change Orders bore dates as late as June of 1968. There is substantial evidence, however, that most of the work reflected by these Change Orders had been completed prior to date of their execution. Kromer, who was employed by Ratner, issued Construction Progress Estimates. He testified that the building was 97.3 percent completed on May 31, 1968, and 98.3 percent completed on June 30, 1968. There is a great deal of evidence of delay in execution of the Change Orders by the Owner and the interim lending institutions.

■ The Owner's argument that the Contractor was not entitled to extensions of time resulting from "customization" Change Orders is without merit. The contract reference to "customization" related only to that type of work reflected in the original plans and specifications. The parties were aware that changes could affect the program work schedule.

The testimony of Richard N. Green, a Construction Consultant, is corroborative of Ratner's grant of some 185 days extensions and significant in relation to the "clockwork" scheduling of work components required to accomplish the original contract completion schedules. Green's study took into consideration the plans and specifications, the computerized Critical Path Scheduling program, all Bulletins, formal Change Orders, Field Change Orders, related correspondence, Daily Progress Reports and Monthly Pay Requests. He computed some 394 days involving requests for extensions. He eliminated those of an "overlapping" nature and those which were not critical. He did not consider delays resulting from labor disputes or severe weather conditions. He arrived at a total of 180 days extension of time to which the Contractor was entitled.

There were unexplained delays on the part of the Owner relating to approval of Change Orders, selections of customization items such as ceramic tile, fixtures and accessories, color selections, etc. These delays did in fact change the scope of the work. Indecision on the part of the Owner with respect to tenant paint color selections was such, as early as July or August of 1967, that painters were moving from one floor to another in the building, completely out of program sequence. Some important work had to be re-done because the original plans and specifications did not comply with city codes.

### The Cross Appeal

The Contractor appeals from the trial court's allowance of a $28,170.00 set-off against the Contractor for non-compliance with the standard required under Bulletin #15 relating to balcony finishes on apartments above the 17th floor. There is substantial evidence to support the Court's finding in this regard. The Contractor contends that there was no admissible evidence of damages.

■ At the time of trial the defects in the concrete finish had not been rectified. The Owner sought bids covering the claimed defects, a schedule of which was submitted to the Contractor. The record reflects that the lowest bid received was predicated upon an inspection and submittal by a Mr. R. W. Graves,

who was not available to testify at trial. However, a Mr. McHenry of the same firm did testify. He updated the Graves bid by 7%. He testified at some length concerning the bids. The Contractor did not offer any evidence regarding the costs of repairs. We hold that although the bids admitted in evidence were hearsay, they were admissible under the Business Records Act, 28 U.S.C. § 1732(a). Hearsay may have affected the weight of these documents, but not their admissibility. The Court's set-off was predicated upon the lowest bid.

We affirm the trial court's judgment against the Owner. We deny the Contractor's cross-appeal from the trial court's allowance of a set-off of $28,170.-00 to the Owner representing repairs to the concrete balconies.

Each party shall bear its own costs in this appeal.