610 A.2d 364

PERINI CORPORATION, A MASSACHUSETTS CORPORATION, PLAINTIFF–APPELLANT, v. GREATE BAY HOTEL & CASINO, INC., T/A SANDS HOTEL & CASINO, INC., A NEW JERSEY CORPORATION, DEFENDANT–RESPONDENT.

Argued March 17, 1992—Decided August 6, 1992.

480

481

*Edward A. Zunz, Jr.,* argued the cause for appellant (*Riker, Danzig, Scherer, Hyland & Perretti,* attorneys; *Edward A. Zunz, Jr.* and *Stuart M. Lederman,* of counsel; *Stuart M. Lederman, Karen M. Patruno,* and *Roberta N. Samuels,* on the briefs).

*Steven A. Arbittier,* a member of the Pennsylvania bar, argued the cause for respondent (*Horn, Kaplan, Goldberg, Gorny & Daniels,* attorneys; *Steven A. Arbittier* and *Jack Gorny,* of counsel and on the briefs).

*William J. Brennan, III,* submitted a brief on behalf of *amicus curiae* The Associated General Contractors of America (*Smith, Stratton, Wise, Heher & Brennan,* attorneys; *William J. Brennan, III,* and *Wendy L. Mager,* of counsel and on the brief).

The judgment of the Court was delivered by

O'HERN, J.

This appeal concerns the extent to which a court may invalidate an arbitration panel's award that was allegedly based on a mistaken determination of law. The issue arises in the context of a construction-management contract for an Atlantic City hotel and casino. The principal errors of law asserted are that the arbitrators (1) failed to observe settled principles of contract law by awarding damages that were not in the contemplation of the parties at the date of the contract and (2) awarded damages for lost profits after the date on which the project was substantially completed. We find that the asserted errors of law were not so gross, unmistakable, or in manifest disregard of the applicable law as to warrant judicial invalidation of the award.

I

The matter arises out of a 1983 construction-management contract entered into by plaintiff, Perini Corporation (Perini), and defendant, Greate Bay Hotel & Casino, Inc., trading as Sands Hotel & Casino (Sands). For purposes of this appeal, we adopt generally the version of the facts set forth in Perini's supplemental brief to this Court.

In 1981, Sands's parent company purchased the Brighton Hotel. The Brighton had experienced steadily-declining revenues for several years before Sands purchased it. Sands, however, was able to reverse that trend, making an $8,000,000 profit during its first year of operation. The Brighton's financial troubles had stemmed from several factors: (1) the hotel was a full block from the boardwalk; (2) there was no entrance visible from the boardwalk; and (3) the company had a poor marketing strategy. Sands realized that in order to increase its revenues, it had to draw a significant number of patrons from the boardwalk.

To achieve that goal, Sands decided to undertake major renovations. On July 21, 1983, it entered into a construction-

management agreement with Perini for a partial renovation of the hotel and casino. Under the terms of the agreement, Perini's responsibilities as construction manager were to coordinate with the owner and the owner's architect, supervise the trade contractors, and set a guaranteed maximum price for the project (originally $16,800,000) in exchange for a $600,000 fee plus reimbursement for actual expenses. If the cost of the project exceeded $20,000,000, Perini would be entitled to four percent of the project costs over $20,000,000 in addition to the agreed upon fee. The hotel and casino were continuously open and operating throughout the partial-renovation project.

The project had several component parts: (1) expansion of the existing casino gaming area; (2) creation of a new food court; (3) renovation of the nineteenth and twentieth floors and the addition of a new twenty-first floor to house an executive plaza club and seven luxury "high-roller" suites; (4) creation of an additional entrance at the southeast corner of the building (the new park entrance); and (5) the creation of a $400,000 ornamental, non-functional glass facade located outside of the east wall, which faces the boardwalk. Sands described the latter as a "new glitzy glass facade on the east side of the building which might act as a magnet to lure a new category of customers—strollers who might leave the boardwalk and walk the long block from the beach to the Sands."

The contract contained no completion date and no "time-of-the-essence" clause. At the time the parties entered into the contract, the owner's architect had not completed the plans, drawings, and specifications. Sands concedes that it would have been impossible to fix a completion date at the date of contracting; thus, the contract provided that "[a]t the time a [g]uaranteed [m]aximum [p]rice is established, * * * a [d]ate of [s]ubstantial [c]ompletion of the [p]roject shall also be established."

The contract defines "substantial completion" as "the date when construction is sufficiently complete * * * so the [o]wner

can occupy or utilize the [p]roject or designated portion thereof for the use for which it is intended." Perini asserts that "substantial completion" is a term of art in the construction industry with uniformly-understood significance related to performance, warranties, payment, and damages. Most significantly, it asserts that under prevailing law no damages for delay may be awarded after substantial completion.

As noted previously, the contract did not contain a completion date because that date was to be fixed at the time that a guaranteed maximum price was established. However, when the guaranteed maximum price was set (originally at $16,800,-000 and later increased to $24,000,000), a substantial completion date had not been placed in the contract.

Sands contends that the parties did agree ultimately to May 31, 1984, as the substantial completion date for the project. The record before the Court shows that the contractual completion dates submitted to the New Jersey Casino Control Commission required substantial completion of the project's three main components (the expansion of the casino, the construction of seven "high-roller" suites, and the new park entrance) on or before June 1, 1984. Significantly, Sands informed Perini that it would postpone the project until 1985 were Perini unable to complete the project before the start of the summer season.

Perini argues that the entire project and various portions thereof reached substantial completion, as defined in the contract, as follows: casino and food court, April 17, 1984; new park entrance and facade, August 31, 1984; suites, September 14, 1984; and the entire project, September 14, 1984. Perini contends that no one disputes that the revenue-producing portions of the work—the expanded casino gaming area and the food courts—were open and operational before Memorial Day and that Perini was entitled to an excusable extension of the completion date for the "high-roller" suites until August 22, 1984. Therefore, for all practical purposes, Perini argues that Sands's only delay claim related to an alleged four-month delay,

from May through August 31, 1984, in the substantial completion of the glass facade. After the entire project had reached substantial completion on September 14, 1984, Perini claims that in keeping with the term-of-art meaning of substantial completion, only "punch list" and warranty work remained to be completed at the site. However, Sands sought to terminate the contract by letter dated December 21, 1984, despite an asserted contractual provision that it could not terminate the contract after substantial completion.

After Sands's purported termination of the contract, Perini brought suit in the Superior Court, Atlantic County, Chancery Division. Perini sought a declaratory judgment that Sands could not terminate the contract after the renovation project had reached substantial completion. On Sands's cross-action, the court determined that the termination issue, as well as any other disputed matters, were subject to arbitration under the contract.

Perini and Sands submitted three issues to the arbitrators: (1) lost profit damages alleged by Sands; (2) contract balances due Perini; and (3) wrongful termination of the contract by Sands. By a two-to-one vote, with the attorney-arbitrator dissenting, the panel awarded Sands over $14,500,000 in damages for lost profits. The arbitrators failed to decide explicitly the issue of whether Sands had the power to terminate Perini's contract after substantial completion. During the arbitration proceedings the parties stipulated that Perini would receive $300,000 plus interest as its contract balance.

Sands sought judicial confirmation of the award in the Chancery Division, while Perini sought to vacate the award. Perini presented a variety of issues to the Chancery Division, not all of which have been made the subject of this appeal. Because we limited our grant of certification primarily to the question of mistake of law, we advert but briefly to the Chancery Division proceeding. Perini argued that there had been no competent evidence before the arbitrators to sustain the award. However,

the court found that with respect to the damage award, there was competent evidence before the arbitrators from "which they could have reasonably concluded as they did."

Next, the Chancery Division addressed the issue of lost profits. Although expressing concern about the damages awarded from September 1 through the end of December 1984, the Chancery judge concluded that the arbitrators had not committed "the kind of gross mistake or clear disregard of applicable law that is required to overturn an award."

In an unreported decision, the Appellate Division affirmed. It held that the arbitrators had not been clearly mistaken as a matter of law and thus refused to vacate the award. The court found that enough evidence had been presented to the arbitrators to allow them to conclude that lost profits were a reasonably-foreseeable event of the breach of the contract. Furthermore, the evidence presented was sufficient to ensure that the lost profit damages were not speculative in nature.

The Appellate Division looked at a number of factors in reaching a decision on the substantial completion issue. First, it reviewed evidence of construction conditions around the casino entrance during the fall of 1984 that precluded access to the casino and prevented "beneficial use" of the entrance. Second, it noted that the concrete steps leading to the new entrance had to be repoured during the fall. Based on those factors the court found that "there is evidence from which the arbitrators could conclude Perini did not complete the job as required by the contract until December 1984, well beyond the projected completion time of the end of May 1984."

The court found also that the award was not manifestly unjust, noting that the actual contract price was $24,000,000, and thus the $14,500,000 in lost profits was not disproportionate to the actual contract price.

We granted certification, 127 *N.J.* 533, 606 *A.*2d 353 (1991), limited to the following issues: (1) whether the asserted mistake of law was reviewable by the courts; (2) the continued

validity of the principle that mistakes of law are the equivalent of undue means; and (3) the disproportionality of the arbitration award. We now affirm the judgment of the Appellate Division.

## II

### A.

Judicial attitudes about arbitration have changed significantly. Although originally there was mistrust of the arbitral process, that attitude has been replaced by a strong judicial commitment to arbitration. In *Southland Corp. v. Keating*, 465 *U.S.* 1, 13–14, 104 *S.Ct.* 852, 859–60, 79 *L.Ed.*2d 1, 13–14 (1984), Chief Justice Burger traced the historic reluctance of the courts to support arbitration to the ancient antipathy between equity and specific performance of arbitration agreements. That reluctance has been all but swept away by judicial recognition that the mindless jealousy of the English courts for their own jurisdiction must yield to the needs of a modern society to develop desirable alternatives to litigation. Our guiding principles should strengthen the systems that encourage those alternatives to litigation, not weaken them. *See* Sanford M. Jaffe & Linda Stamato, *Dispute Resolution: Complementary Programs and the Courts* 13 (Jan. 1983) (unpublished paper available from the Administrative Office of the Courts).

The New Jersey courts realized that adoption of the hostile attitude displayed by the English courts could have been detrimental to our judicial system. Thus, our courts have long encouraged the use of arbitration proceedings as an alternative forum. *See* James B. Boskey, *A History of Commercial Arbitration in New Jersey Part I*, 8 *Rut.–Cam.L.J.* 1, 2 (1976). As early as 1794, New Jersey enacted a statute that codified the English common law. *Id.* at 8. That arbitration statute was reformed in 1923 and is still in existence today. *See N.J.S.A.* 2A:24–1 to –11.

Arbitration has been defined as follows: " '(1) It is the *voluntary* reference of a dispute by the parties to (2) an arbitrator or arbitrators *chosen* by the parties who (3) agree the decision will be final and *binding.*' " *Levine v. Wiss & Co.*, 97 *N.J.* 242, 257, 478 *A.*2d 397 (1984) (O'Hern, J., dissenting) (quoting Arthur J. Simpson, Jr., *Whither Judicial Arbitration in New Jersey* 12 (Mar. 9, 1982) (unpublished manuscript available from the State Library)).

In *Barcon Associates, Inc. v. Tri–County Asphalt Corp.*, 86 *N.J.* 179, 430 *A.*2d 214 (1981), we explained that "[a]rbitration is 'a substitution, by consent of the parties, of another tribunal for the tribunal provided by the ordinary processes of law,' and its object is 'the final disposition, in a speedy, inexpensive, expeditious and perhaps less formal manner, of the controversial differences between the parties.' " *Id.* at 187, 430 *A.*2d 214 (quoting *Eastern Eng'g Co. v. City of Ocean City*, 11 *N.J.Misc.* 508, 510–11, 167 *A.* 522 (Sup.Ct.1933)).

▮ Any party can submit a matter to arbitration. Our Arbitration Act provides: "Two or more persons by their agreement in writing may submit to arbitration a controversy existing between them at the time of the agreement * * *." *N.J.S.A.* 2A:24–2. Parties can agree to follow the procedures established by the American Arbitration Association (AAA), which contain the usual trial-type format, or they can agree to any other type of procedure to resolve the dispute. In this case, the parties agreed to follow the Construction Industry Arbitration rules of the AAA. Under those rules, a national panel of construction arbitrators is established and maintained. Also, those rules allow a pre-hearing conference and a preliminary hearing, prescribe the qualifications of the arbitrators and the number thereof, and establish the order and tenor of the proceedings. The rules do not require a specific format for the award. They state only that "[t]he award shall be in writing and shall be signed either by the sole arbitrator or by at least a majority if there be more than one." Most significantly, the

rules provide that "[t]he arbitrator may grant any remedy or relief which is just and equitable within the terms of the agreement of the parties."

■ Once an arbitration award has been entered, any party to the arbitration may seek confirmation of the award with the court within three months of the arbitrators' decision. *N.J.S.A.* 2A:24–7. The award will be confirmed unless "the award is vacated, modified or corrected." *Ibid.* As at common law, the statute narrowly defines the circumstances permitting an arbitration award to be vacated. Those reasons are as follows:

a. Where the award was procured by corruption, fraud or undue means;

b. Where there was either evident partiality or corruption in the arbitrators, or any thereof;

c. Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause being shown therefor, or in refusing to hear evidence, pertinent and material to the controversy, or of any other misbehaviors prejudicial to the rights of any party;

d. Where the arbitrators exceeded or so imperfectly executed their powers that a mutual, final and definite award upon the subject matter submitted was not made. [*N.J.S.A.* 2A:24–8.]

Sections a and d are relevant here and we shall refer to them as the "undue means" and the "exceeded their powers" provisions, respectively.

## B.

■ Obviously a mistake of law is not one of the stated grounds for vacating an award. Nor, indeed, is sufficiency of the evidence. But some content must be given to those statutory-review provisions. Thus, arbitrators may not make an award that is wholly bereft of evidential support. *McHugh Inc. v. Soldo Constr. Co.*, 238 *N.J.Super.* 141, 147–48, 569 *A.*2d 293 (App.Div.1990).

Our case law has been less than precise about the scope of judicial review of arbitral errors of law. In *Barcon Associates,* the Court said that " '[a]rbitrators decide both the facts and the law,' " 86 *N.J.* at 187, 430 *A.*2d 214 (quoting *Daly v. Komline–Sanderson Eng'g Corp.*, 40 *N.J.* 175, 178, 191 *A.*2d 37 (1963)).

However, in *In re Arbitration Between Grover and Universal Underwriters Insurance Co.*, 80 *N.J.* 221, 230–31, 403 *A.*2d 448 (1979), the Court set aside an arbitration award because the arbitrator had mistakenly found coverage under an insurance policy without the corroboration required by the terms of the policy. Such an award was viewed as both exceeding the powers of the arbitrator and having been procured by undue means. The *Grover* Court cited *Held v. Comfort Bus Line*, 136 *N.J.L.* 640, 57 *A.*2d 20 (Sup.Ct.1948). In that case, the term "undue means" was first interpreted under the present statute to embrace a mistake of law. Justice Heher, sitting at the Passaic Circuit, explained that undue means is found in two situations:

> (1) where the arbitrator meant to decide according to law, and clearly had mistaken the legal rule, and the mistake appears on the face of the award or by the statement of the arbitrator; and (2) where the arbitrator has mistaken a fact, and the mistake is apparent on the face of the award itself, or it is admitted by the arbitrator himself. [*Id.* at 641–42, 57 *A.*2d 20.]

Justice Heher explained further that "[o]rdinarily, a mistake or error of law or fact is not fatal unless there is a resulting failure of intent or the error is so gross as to suggest fraud or misconduct." *Id.* at 642, 57 *A.*2d 20.

Although lower court decisions have used the phrase "undue means" to connote a mistake of law, the only New Jersey Supreme Court case equating a mistake of law with undue means is *Perez v. American Bankers Insurance Co.*, 81 *N.J.* 415, 409 *A.*2d 269 (1979). That opinion, in citing *Grover*, suggested that a mistake of law is the equivalent of undue means. *Id.* at 420, 409 *A.*2d 269.

Later, in *Faherty v. Faherty*, 97 *N.J.* 99, 477 *A.*2d 1257 (1984), the Court vacated a portion of an arbitration award based on a mistake of law under *N.J.S.A.* 2A:24–8d, the "exceeded their powers" provision. There, the parties' separation agreement provided for arbitration of any later disputes and contained a provision that New Jersey law would govern the resolution of such disputes. Based on that provision, the Court vacated an arbitral award under the "exceeded their powers"

section because the arbitrator had failed to follow New Jersey law in granting alimony to the wife after she had remarried. *See also Selected Risks Ins. Co. v. Allstate Ins. Co.,* 179 *N.J.Super.* 444, 432 *A.*2d 544 (App.Div.) (vacating arbitrators' award under both the "undue means" and "exceeds their powers" provisions for failure to follow the law), *certif. denied,* 88 *N.J.* 489, 443 *A.*2d 705 (1981).

There is little profit in seeking to pigeonhole a mistake of law under either of those statutory sections. Suffice it to observe that "[w]hen the parties intend that their contract be interpreted in accordance with the law, [the arbitrator's] authority is circumscribed by being limited to carrying out that intent." *Kearny Pba Local # 21 v. Town of Kearny,* 81 *N.J.* 208, 217, 405 *A.*2d 393 (1979). In this case, Sands does not disagree that the arbitrators intended to interpret the contract and remedy the breach in accordance with law. Specifically, Sands stated that "[t]he arbitrators *did* intend to apply the law and * * * their award is firmly supported by the applicable legal principles." We do not intend, however, that the arbitrators be judges or that their decisions be subject to the same appellate supervision as those of judges.

■ The real question is the scope of judicial review. Even in the public sector, arbitrators have broad latitude to resolve questions of law when interpreting contracts. In public-sector arbitration the scope of judicial review "is limited to determining whether or not the interpretation of the contractual language is reasonably debatable." *Kearny PBA Local # 21, supra,* 81 *N.J.* at 221, 405 *A.*2d 393. Surely, in the private sector similar latitude should be allowed at the very least. Thus, in private-sector arbitration an arbitrator's determination of a legal issue should be sustained as long as the determination is reasonably debatable. *See Department of Law & Pub. Safety v. State Troopers Fraternal Ass'n,* 91 *N.J.* 464, 469, 453 *A.*2d 176 (1982) ("Arbitrators in the private sector have broad discretion in determining legal issues."); *Communications*

*Workers of Am., Local 1087 v. Monmouth County Bd. of Social Servs.*, 96 *N.J.* 442, 450, 476 *A.*2d 777 (1984) ("parties in the private sector may explicitly authorize the arbitrator to decide legal issues").

Whether the arbitrators are viewed as having acted with "undue means," or having "exceeded their powers," the judicial inquiry must go beyond a search for mere mistakes of law. Were we to decide otherwise, arbitration would simply become another form of private, non-jury trial. A scope of review that allows an arbitration decision to stand when the interpretation of law is reasonably debatable is consistent with the earlier formulation set forth in *Held, supra,* 136 *N.J.L.* 640, 57 *A.*2d 20. That formulation requires that the arbitrators must have clearly intended to decide according to law, must have clearly mistaken the legal rule, and that mistake must appear on the face of the award. In addition, the error, to be fatal, must result in a failure of intent or be so gross as to suggest fraud or misconduct.

That scope of review is consistent with formulations found in other jurisdictions.[1] For example, under New York law an arbitration award "will not be vacated even though the court concludes that [the arbitrator's] interpretation of the agreement * * * misapplies substantive rules of law, unless it is violative of strong public policy, or is totally irrational, or exceeds a specifically enumerated limitation on [the arbitrator's] power." *In re Arbitration Between Silverman and Benmor Coats, Inc.,* 61 *N.Y.*2d 299, 473 *N.Y.S.*2d 774, 779, 461 *N.E.*2d 1261, 1266 (1984). In Illinois, even "[g]ross errors of judgment in law or a gross mistake of fact are not grounds for vacating an

---

[1]Although New Jersey has not adopted the Uniform Arbitration Act, see *Uniform Arbitration Act,* Table of Jurisdictions, 7 *U.L.A.* (1956) (UAA), the provisions pertinent here for setting aside an award under our law are similar to those under the UAA. Thus, we look to the decisions of several UAA jurisdictions, as well as jurisdictions that have not adopted the UAA, in reaching our decision.

award unless the mistakes or errors are apparent upon the face of the award." *Rauh v. Rockford Prods. Corp.*, 143 *Ill.*2d 377, 158 *Ill.Dec.* 523, 531, 574 *N.E.*2d 636, 644 (1991).

In California, where an arbitrator's award is "made binding by the contract * * * and the legal issue concerns its construction, only a mistake of law egregious enough to amount to an arbitrary remaking of that contract is judicially cognizable." *Pacific Gas and Elec. Co. v. Superior Court of Sutter County*, 234 *Cal.App.*3d 428, 277 *Cal.Rptr.* 694, 701, *cert. granted*, 281 *Cal.Rptr.* 765, 810 *P.*2d 997 (1991). *See also Celtech, Inc. v. Broumand*, 584 *A.*2d 1257, 1258 (D.C.App.1991) ("To persuade a court to interfere with an arbitration award, a party must show corruption or 'gross mistake'; an error of judgment will not do."); *Jackson Trak Group, Inc. v. Mid States Port Auth.*, 242 *Kan.* 683, 751 *P.*2d 122, 127 (1988) (errors of law are not sufficient to vacate award fairly made in absence of "fraud, misconduct, or other valid objections"); *Fischer v. Guaranteed Concrete Co.*, 276 *Minn.* 510, 151 *N.W.*2d 266, 270 (1967) (arbitrators award will not be set aside for mistake of law absent "fraud, mistake in applying his own theory, misconduct, or any other disregard of duty"); *Bailey and Williams v. Westfall*, 727 *S.W.*2d 86, 90 (Tex.Ct.App.1987) ("Not every error of * * * law warrants setting aside an arbitration award, but only those errors which result in a fraud or some great and manifest wrong and injustice."); *Racine Unified School Dist. v. Service Employees' International Union, Local 152*, 158 *Wis.*2d 51, 462 *N.W.*2d 214, 216 (1990) (only "manifest disregard of the law" would justify setting aside an arbitrator's decision).

Finally, federal precedent offers a concise formulation of a set of principles for judicial review of arbitral mistakes of law:

"Manifest disregard of the law" by arbitrators is a judicially-created ground for vacating their arbitration award, which was introduced by the Supreme Court in *Wilko v. Swan*, 346 *U.S.* 427, 436–37, 74 *S.Ct.* 182, 187–88, 98 *L.Ed.* 168 (1953). It is not to be found in the federal arbitration law. 9 U.S.C. § 10. Although the bounds of this ground have never been defined, it clearly means more than error or misunderstanding with respect to the law. *Siegel v. Titan Indus. Corp.*, 779 *F.*2d 891, 892–93 (2d Cir.1985); *Drayer v. Krasner*, 572 *F.*2d

348, 352 (2d Cir.), *cert. denied,* 436 *U.S.* 948, 98 *S.Ct.* 2855, 56 *L.Ed.*2d 791 (1978); *I/S Stavborg v. National Metal Converters, Inc.,* 500 *F.*2d 424, 432 (2d Cir.1974). The error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator. Moreover, the term "disregard" implies that the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it. *Bell Aerospace Company Division of Textron, Inc. v. Local 516,* 356 *F.Supp.* 354, 356 (W.D.N.Y.1973), *rev'd on other grounds,* 500 *F.*2d 921 (2d Cir.1974). To adopt a less strict standard of judicial review would be to undermine our well established deference to arbitration as a favored method of settling disputes when agreed to by the parties. *United Steelworkers v. American Manufacturing Co.,* 363 *U.S.* 564, 80 *S.Ct.* 1343, 4 *L.Ed.*2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 *U.S.* 574, 80 *S.Ct.* 1347, 4 *L.Ed.*2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 *U.S.* 593, 80 *S.Ct.* 1358, 4 *L.Ed.*2d 1424 (1960); *Saxis Steamship Co. v. Multifacs International Traders, Inc.,* 375 *F.*2d 577 (2d Cir.1967). Judicial inquiry under the "manifest disregard" standard is therefore extremely limited. The governing law alleged to have been ignored by the arbitrators must be well defined, explicit, and clearly applicable. We are not at liberty to set aside an arbitration panel's award because of an arguable difference regarding the meaning or applicability of laws urged upon it. [*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 *F.*2d 930, 933–34 (2d Cir.1986).]

█ In short, "the role of the courts in reviewing arbitration awards is extremely limited." *Local 153, Office & Professional Employees Int'l Union v. Trust Co. of New Jersey,* 105 *N.J.* 442, 448, 522 *A.*2d 992 (1987). We sit not as an appellate court to review arbitral decisions of law but only to safeguard against interpretive error that may be characterized on its face as gross, unmistakable, undebatable, or in manifest disregard of the applicable law and leading to an unjust result.

We note that the Chief Justice has forcefully marshaled the reasons to overrule our prior precedent with respect to judicial review of arbitration awards. He points to the Appellate Division decision in *Brooks v. Pennsylvania Manufacturers' Ass'n Insurance Co.,* 121 *N.J.Super.* 51, 296 *A.*2d 72 (1972), *modified on other grounds,* 62 *N.J.* 583, 303 *A.*2d 884 (1973), as the point at which the lower courts began expanding the otherwise narrow "mistake of law" exception. *Post* at 522–525, 610 *A.*2d at 386–387. However, the *Brooks* mistake of law exception has never been approved by this Court. We do not

believe that prior precedent precludes the result that we reach and see no need to revisit the issues. Nor do we envision a threat to arbitration processes or an "anti-arbitration bias" in our decision. Appeals of this nature are almost non-existent. In the eleven years since the *Barcon* decision, we can find no meritorious review in our Court of a commercial-arbitration award.

Rather, we believe that the arbitration process is strengthened by having a limited reservoir of judicial review. *Faherty, supra,* 97 *N.J.* 99, 477 *A.*2d 1257, is a good example. To let stand an award of alimony that would, on its face, violate New Jersey's statutory law and policy would undermine public confidence in arbitration as a credible system of complementary dispute resolution. We are confident that the limited judicial review that we contemplate will strengthen, rather than weaken, such alternatives to litigation. It is not surprising, in view of the very large sums of money involved in this case and the unusual theory of damages accepted by this arbitration panel, that the arbitral party would seek judicial review.

### III

We turn now to the application of those principles to the facts of this case. Perini alleges that several mistakes of law in this arbitration were clear, substantial, and highly prejudicial. We shall address each.

1. Was it a mistake to award damages for lost profits that were not in the contemplation of the parties at the date of contract?

Since *Hadley v. Baxendale,* 9 *Ex.* 341, 156 *Eng.Rep.* 145 (1854), lawyers and judges have pondered the difficult issue of harnessing the concept of expectation damages. Should the delay in transit of a crankshaft needed to drive a grist mill have caused a common carrier to be liable for the lost profits of the mill? The rule of consequential damages is said to have been devised to meet the demands of a rapidly-expanding market

society. Whatever the doctrine's origins, it is a settled part of our legal landscape.

"Compensatory damages are designed 'to put the injured party in as good a position as he would have had if performance had been rendered as promised.' 5 *Corbin, Contracts* § 992, p. 5 (1951)." What that position is depends upon what the parties reasonably expected. It follows that the defendant is not chargeable for loss that he did not have reason to foresee as a probable result of the breach when the contract was made. *Hadley v. Baxendale*, 9 *Ex.* 341, 156 *Eng.Rep.* 145 (1854); *accord Crater v. Binninger*, 33 *N.J.L.* 513 (E. & A. 1869). The oft-quoted language in *Hadley* for this proposition is:

Where two parties have made a contract, which one of them has broken, the damages which the other party ought to receive, in respect of such breach, should be such as may fairly be considered either arising naturally, *i.e.*, according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it. [9 Ex. at 354, 156 Eng.Rep. at 151] [*Donovan v. Bachstadt*, 91 *N.J.* 434, 444–45, 453 *A.*2d 160 (1982) (footnote omitted) (citations omitted).]

█ Lost profits fall under the category of consequential damages. *Seaman v. United States Steel Corp.*, 166 *N.J.Super.* 467, 471, 400 *A.*2d 90 (App.Div.), *certif. denied*, 81 *N.J.* 282, 405 *A.*2d 826 (1979); E. Allan Farnsworth, *Contracts* § 12.14 (1982).

█ Perini argues that lost profits were not contemplated by the parties at the time of contract most significantly because the parties "specified in their [c]ontract the precise remedies available in the event of a breach by the other side." Perini points to contract clauses 12.1.1 (construction manager agrees to indemnify owner), 12.4 (owner required to purchase property insurance), 13.2.1 (owner may make good on obligations construction manager fails to perform), and 13.2.2 (where construction manager fails to perform duties under the circumstances described, owner may terminate employment of construction manager) in support of its argument. Had either party contemplated damages for lost profits, Perini argues, a provision would have been included in the contract. For example, Sands would have placed a liquidated damages clause in the contract or it would have included a "time-of-the-essence" clause. As

one commentator has noted, liquidated damages clauses are included in construction contracts as a "predetermined assessment of compensatory damages for failure to substantially complete the construction project within the contract time." Steven M. Siegfried, *Introduction to Construction Law* § 8.03(d) (1987) (hereinafter Siegfried).

Furthermore, Perini argues that it would not have accepted such a great risk for the minimal fee of $600,000. Thus, Perini argues that because the parties did not mention lost profits as a remedy in the case of late completion, lost profits cannot be awarded, and therefore the award of lost profits was not in accordance with the terms of the contract. Also, Perini contends that the parties could not have anticipated that the failure to complete a non-functional, ornamental facade could lead to damages of millions of dollars. Finally, even if lost profits were contemplated by the parties, they did not intend to allocate the risk of loss to Perini.

However, the testimony of Sands's personnel clearly established that Sands intended to increase its profits by attracting more patrons from the boardwalk. Certainly, Perini had to be aware of Sands's motive at the time it entered into the contract. Also, Sands stressed the importance of timely completion of the project. On numerous occasions Sands informed Perini that it wished to have the project completed prior to the beginning of the summer season, the casino industry's busiest season. Perini was well aware of the projected completion date. In an inter-office memorandum, dated September 26, 1983, Perini's project manager wrote: "The projected completion date is June 15, 1984, which is 12 work days beyond the required completion date on May 31, 1984." Furthermore, Perini knew that Sands would delay construction if the project could not be completed by May 1984. Thus, it appears that the arbitrators had more than enough evidence to conclude that Perini was aware that its failure to complete the project in a timely fashion could lead to a significant loss of income. In fact, a letter written on June 12, 1984, by William Weidner, Sands's president, specifically

informed Perini that Sands intended to seek damages. Certainly, based on the evidence submitted to them, the arbitrators could have concluded that the damages were reasonably foreseeable. Thus, Perini's first alleged mistake of law must fail.

2. Was it a mistake to award damages for lost profits after the date when the project was substantially completed?

A.

Perini argues that if the award of lost profits from September through December 1984 is allowed to stand, the well-established rule that limits damages after substantial completion will be violated because the parties agreed that substantial completion of the project occurred on September 15, 1984.

Substantial completion has a definite meaning in the construction industry. *Amicus,* Associated General Contractors of America (AGCA), tells us that the contract entered into by Perini and Sands is substantially the same as AGCA Document No. 500, which in turn is modeled on forms distributed by the American Institute of Architects (AIA). Those AIA forms are widely used in the construction industry. Justin Sweet, *Sweet on Construction Industry Contracts: Major AIA Documents* § 1.1 (1987) (hereinafter Sweet). The definition of substantial completion that appears in the contract reads as follows: "The date of [s]ubstantial [c]ompletion of the [p]roject or a designated portion thereof is the date when construction is significantly complete in accordance with the [d]rawings and [s]pecifications so the [o]wner can occupy or utilize the [p]roject or designated portion thereof for the use for which it is intended." According to Professor Sweet, the AIA defines substantial completion as "what the owner bargains for, a mostly completed project within the required time." Sweet, *supra,* § 16.15. Professor Sweet also notes that generally AIA contracts contain a clause that requires a contractor, on substantial completion, to submit "a comprehensive list of items to be completed or corrected." That is generally known as a "punch list." *Ibid.* Although the specific clause described

by Professor Sweet was not included in the contract here, the definition of punch list and its link to substantial completion will be helpful to our analysis. Generally, the punch list includes those items that restrict the final completion of the project. 2 Steven G.M. Stein, *Construction Law* ¶ 7.09 at 7–78 (1991) (hereinafter Stein).

Another factor that is indicative of substantial completion is the issuance of a certificate of occupancy by the municipality, normally by its building department. *Id.* at 7–77. When an owner attempts to assess liquidated damages, a "certificate of occupancy should arguably determine the date of substantial completion." *Ibid.*

In its *amicus* brief, AGCA argues that substantial completion in construction law and the common-law doctrine of substantial performance are different, without clearly stating the consequence of that purported difference. It appears that substantial completion is a term used in the construction industry to measure the time commitment portion of the contract. Sweet, *supra*, § 17.4. In any case, the definition of substantial completion used by the parties is similar to the definition of substantial performance used by the courts. *See Jardine Estates, Inc. v. Donna Brook Corp.*, 42 *N.J.Super.* 332, 337, 126 *A.*2d 372 (App.Div.1956). Perini in its papers and the case law use the terms interchangeably. Construction-industry authorities agree that the courts use the terms interchangeably. Stein, *supra*, ¶ 6.07[3] & n. 13 at 6–18.

## B.

As noted previously, Perini contends that it substantially completed the project by mid-September 1984, and therefore should not be liable for lost profits from that date to the date of termination in December 1984. According to Perini, the award of lost profits for that period amounted to approximately

$4,000,000.[2] Construction industry treatises agree with Perini. Siegfried states:

> The doctrine of substantial performance can be used as a defense to a breach of contract action for failure to complete a project within the contract time. In fact, unless otherwise specifically agreed, a liquidated damages provision is not enforceable for the period beyond the point of substantial completion. [Siegfried, *supra*, § 8.05.]

As Williston points out, most commonly, the courts have applied the doctrine of substantial performance to cases that involve building contracts. The doctrine has been interpreted to allow a builder who has substantially performed a contract to recover the full price under the contract less any damages suffered by the owner due to the builder's breach. 6 *Williston on Contracts* § 842 (3d ed. 1962). That rule generally is followed in most American jurisdictions. 3A *Corbin on Contracts* § 701 (1960).

The case law is in accord. In *Jardine Estates, supra,* the court stated that there is substantial performance of a contract " 'where all the essentials necessary to the full accomplishment of the purposes for which the thing contracted for has been constructed are performed with such an approximation to complete performance that the owner obtains substantially what is called for by the contract.' " 42 *N.J.Super.* at 337, 126 *A.*2d 372 (quoting 9 *Am.Jur., Building and Construction Contracts* § 42).

In *Feeney v. Bardsley,* 66 *N.J.L.* 239, 49 *A.* 443 (E. & A. 1901), the Court found no error in the lower court's charge to the jury where it stated:

> [I]f the contractor has substantially performed his contract, even though he has failed to do so in some minor particulars, he is entitled to recover the contract price, less what will be a fair allowance to the owner to make good the defects in performance of the contract. [*Id.* at 240, 49 *A.* 443.]

---

[2]Sands agrees that the award for that period was approximately $4,000,000. That estimate is based on the testimony of Sands's expert. The amount cannot be determined with specificity because the arbitrators failed to delineate how much of the total award covered profits lost during that period.

In *Van Dusen Aircraft Supplies, Inc. v. Terminal Construction Corp.*, 3 *N.J.* 321, 70 *A.*2d 65 (1949), this Court, citing *Feeney* approvingly, stated in dicta that the "rule of damages where a building is substantially completed, but is defective in some particulars, is the cost of making good the omitted or defective work." *Id.* at 329, 70 *A.*2d 65. *Accord Power-Matics, Inc. v. Ligotti*, 79 *N.J.Super.* 294, 191 *A.*2d 483 (App. Div.1963); *Winfield Mut. Hous. Corp. v. Middlesex Concrete Prods. and Excavating Corp.*, 39 *N.J.Super.* 92, 120 *A.*2d 655 (App.Div.1956); *Amerada Hess Corp. v. Quinn*, 143 *N.J.Super.* 237, 362 *A.*2d 1258 (Law Div.1976).

## C.

Perini and *amicus*, AGCA, argue that because the arbitrators awarded damages beyond the substantial completion date allegedly admitted by the parties, they departed from both public (judicial decisions) and private law (the parties' contract) in reaching their decision and thus imperfectly executed their powers, in violation of *N.J.S.A.* 2A:24–8d.

When assessing damages after substantial completion of a project, courts have treated liquidated damages in a manner similar to that of lost profits. Thus, we have included several liquidated damages cases in our analysis. Courts have found that liquidated damages may not be imposed after the owner "is able to put the project to its beneficial use or the owner has taken occupancy." Stein, *supra*, ¶ 6.07[3] at 6–18. The rationale behind that policy is that liquidated damages otherwise would become a penalty because those damages are designed to approximate an owner's loss before occupancy. *Id.* at 6–19. The reason for limiting liquidated damages was succinctly stated in *Stone v. City of Arcola*, 181 *Ill.App.*3d 513, 130 *Ill.Dec.* 118, 536 *N.E.*2d 1329 (Ill.App.Ct.1989):

> The trial court found substantial completion on October 10, 1983. Since the project was sufficiently complete at the time to be used for the purpose for which it was intended, then it would seem appropriate to construe the liquidated damages provision to close at the time of substantial compliance, even though

> there may be minor repairs, adjustments, or finishing work remaining. After all, if the contractor can get paid at substantial compliance, that is the logical time to discontinue the applicability of the liquidated damages clause. If the contractor fails to complete the additional work, the owner's remedy is to have someone else complete it and sue the contractor to recover the expense. [*Id.* at 1338.]

That rule was applied in *Monsen Engineering Co. v. Tami-Githens, Inc.*, 219 *N.J.Super.* 241, 530 *A.*2d 313 (App.Div.1987), a case involving a liquidated damages clause in a contract for the installation of heating systems in a public-housing project. The contract should have been completed by September 25, 1982; however, the contract was not substantially completed until December 31, 1984. *Id.* at 244, 530 *A.*2d 313. The parties agreed that the date of substantial completion (December 31, 1984) was appropriate for purposes of calculating delay damages. *Ibid.* The Appellate Division found that the trial court, relying on those dates, had correctly assessed the delay as 800 days and affirmed the liquidated damages award. *Id.* at 251, 530 *A.*2d 313.

Also, in *Utica Mutual Insurance Co. v. DiDonato*, 187 *N.J.Super.* 30, 453 *A.*2d 559 (App.Div.1982), a case involving a contract for electrical work for the completion of a construction project at Stockton State College, the plaintiff argued that the trial judge had erred in assessing the date of substantial completion. *Id.* at 39, 453 *A.*2d 559. The plaintiff asserted that substantial completion had occurred months before the actual completion date of May 14, 1976, and therefore it should not be liable for liquidated damages after the substantial completion date. The Appellate Division remanded the issue to the trial court, finding that the Director of the Division of Building and Construction had testified that substantial completion of the entire project had occurred "around June of 1975." *Id.* at 41, 453 *A.*2d 559. The court stated that it was not aware if the entire project had been occupied or used for its intended purpose during the September 1975 semester. *Ibid.* Thus, it was necessary to determine the substantial completion date prior to assessing the liquidated damages award. *See also Public*

*Health Trust of Dade County v. Romart Constr.*, 577 *So.*2d 636 (Fla.Dist.Ct.App.1991) (liquidated damages awarded for sixty-eight day delay in failing to substantially complete the project); *Stone v. City of Arcola, supra*, 536 *N.E.*2d 1329 (liquidated damages can only be awarded until substantial completion date); *American Druggists Ins. Co. v. Henry Contracting, Inc.*, 505 *So.*2d 734 (La.Ct.App.) (same), *cert. denied*, 511 *So.*2d 1156 (La.1987); *Page v. Travis–Williamson County Water Control and Improvement Dist. No. 1*, 367 *S.W.*2d 307, 310 (Tex.1963) (holding substantial completion had occurred because water district "took possession of all the lines, filled them with water and began using them to serve the customers of the water district").

Case law also suggests that, like liquidated damages, lost profits can be assessed up to the date of substantial completion. For example, in *D.A. Davis Construction v. Palmetto Properties, Inc.*, 281 *S.C.* 415, 315 *S.E.*2d 370 (1984), the court awarded three months' lost rental income to the owner for the builder's failure to substantially complete the project on the date specified in the contract. *Id.* at 372. The owner presented evidence that the property was to have been rented to a beer distributor upon substantial completion. *See also Hemenway Co. v. Bartex, Inc.*, 373 *So.*2d 1356 (La.Ct.App.) (holding that the owner of retail store should receive the interest it had paid on interim financing and the rent paid on the old building for the period of delay until substantial completion), *cert. denied*, 376 *So.*2d 1272 (La.1979); *Herbert & Brooner Constr. Co. v. Golden*, 499 *S.W.*2d 541 (Mo.Ct.App.1973) (awarding delay damages for lost rental on theater and the costs of extending a construction loan until date of substantial completion). *Cf. Brooks Towers Corp. v. Hunkin–Conkey Constr. Co.*, 454 *F.*2d 1203 (10th Cir.1972) (holding no lost rentals can be awarded where delay in substantial completion was excusable).

Thus, Perini's argument that delay damages cannot be awarded after substantial completion of the contract is amply supported by the case law and construction-industry practice.

Had the arbitration panel found that Perini had substantially completed the project, as that term is defined in the contract, by September 15, 1984, then it may have erred in awarding lost profits from that date to the time Sands terminated the contract in December 1984.

The Appellate Division resolved the issue by reasoning that there was enough evidence for the arbitrators to decide that substantial completion had not occurred before September 15, 1984. The court stated that "[t]his is not a case from which it can be concluded the arbitrators were clearly mistaken as a matter of law or fact on Perini's failure to substantially complete the project by May 31, 1984, or the failure to substantially complete it by December 1984."

That finding would not otherwise present a problem except that Sands appeared to agree, although it did not stipulate during the arbitration proceeding, that substantial completion of the project had occurred on September 15, 1984. For example, Sands stated in its Appellate Division brief:

Although a temporary certificate of occupancy issued for the suites on September 15, 1984 * * * work was still being done on some of the suites after that date. * * * At the time Perini was terminated, there was still much "punch list" work to be done. Perini never did complete the punch list.

It also stated:

While it is true (and Greate Bay has admitted) that substantial completion of the construction was achieved by September 15, 1984, this did not preclude Greate Bay from terminating Perini.

That language suggests that Sands conceded generally that most of the work had been completed by September 15, 1984. The language does not suggest, however, that Sands fully conceded either that an award of consequential damages was precluded after September 15, 1984, or that it intended to give the expression "substantial completion" its construction-industry "term-of-art" meaning. Obviously, the Chancery judge was greatly troubled by the award of lost profits after September 15, 1984, stating that "the contract was substantially complete and all the problems which were related as applying to the summer season were reduced."

We have verified the various transcript references that refer to the condition of the property after September 15, 1984. For example, William Weidner testified that as of Thanksgiving 1984, Sands "had a full-fledged disaster on [its] hands." Also, the lighted, glass-enclosed elevator, which was visible from the boardwalk and was part of the new park entrance, was not completed and operational until late November 1984. Similarly, Perini's work on the glass facade at the vehicle entrance on Indiana Avenue continued through the fall. Perini often had trucks and/or cranes parked on Indiana Avenue adjacent to or in the new entrance. Thus, it appears, as Sands argues, that although it was able to occupy the new park entrance in the fall while the renovation work continued, it greatly detracted from the building's appearance, obstructed customer access, disrupted operations, and contributed to Sands's loss of business.

At its root, the doctrine of substantial performance "rests on principles of fairness." *Amerada Hess Corp., supra,* 143 *N.J.Super.* at 253, 362 *A.*2d 1258. It is intended to avoid the harshness of common-law contract doctrine so that the right of compensation of those who have performed " 'in all material and substantive particulars * * * may not be forfeited by reason of mere technical or unimportant omissions or defects.' " *Ibid.* (quoting *Gillespie Tool Co. v. Wilson,* 123 *Pa.* 19, 16 *A.* 36, 37 (1888)).

Sands contracted with Perini in large measure for the construction of an ornamental facade, which was intended to draw people to the casino. To apply the doctrine against Sands might be inequitable because Sands never received what it bargained for—an ornamental glass facade that would attract clientele to its casino. Such an appearance was not entirely achieved by September 15. The arbitrators could have found that the uncompleted work was not a "mere technical or unimportant omission[ ] or defect[ ]." Because the doctrine rests on fairness, the arbitrators may have considered it fair to award damages even though the entrance could be used in its uncompleted state. *See Birch Cooley v. First Nat'l Bank of Minne-*

*apolis,* 86 *Minn.* 385, 90 *N.W.* 789, 790 (1902) (Rule of substantial performance does not apply "where deviations from the contract are such that an allowance out of the contract price would not give the other party essentially what [it] contracted for.").

Perini's argument also fails to take into account the possibility that the public's perception of the Sands building during the critical summer months could have had a significant impact on Sands's operations in the fall. There was evidence in the record concerning the importance of introducing the renovated facility to the public during the peak summer season. A Sands executive testified that the image created by an Atlantic City casino in the summer carries over into the following months. Thus, the situation is not directly analogous to that of a theater owner whose profits resume when the project is substantially completed, *Herbert & Brooner, supra,* 499 *S.W.*2d 541, or the retail store owner who is able to transfer operations from one store to another, *Hemenway, supra,* 373 *So.*2d 1356. Here, the arbitrators could have concluded that the delay in completion was an event of non-performance that carried over into the fall resulting in significant consequential damages after substantial completion. In other words, to give the worst case scenario, if, during a renovation, a contractor had left residual materials in a ventilator system that had caused a wide-spread epidemic in a hotel (as in the famous Legionnaire's disease case in Philadelphia, see Tom Mathews et al., *The Mystery Fever,* Newsweek, Aug. 16, 1976 at 16), would anyone doubt that after the project had been substantially completed, *i.e.,* fully renovated, the consequential damages incurred by the proprietor would linger long thereafter? An event of non-performance caused a loss of income even after completion. We do not suggest that that is an identical or apt analogy; however, the evidence submitted to the arbitrators suggested that the casino was presented to the public in a poor light due to Perini's delay in completion. That delay and the resulting appearance could have caused profits to lag over the fall. Thus, the arbitrators' decision does not

appear to depart from any clear holding that consequential damages cannot be awarded if the residual effects of non-performance of the contract are carried over into a period when the building is operational.

3. Was it a mistake to award damages for lost profits to a new business?

 Perini argues that the renovation project amounted to a new business. In *Weiss v. Revenue Building and Loan Ass'n,* 116 *N.J.L.* 208, 182 *A.* 891 (E. & A. 1936), the Court stated that lost profits for a new business are "too remote, contingent and speculative to meet the legal standard of reasonable certainty." *Id.* at 212, 182 *A.* 891. Sands questions that argument. It points out that the casino had a proven track record; the location and nature of the business never changed; and the management team never changed.

However, even were we to consider profits from the 1984 season as those of a new business, the trend in recent cases has been to award lost profits for a new business when they can be proved with reasonable certainty. Robert L. Dunn, *Recovery of Damages for Lost Profits,* § 4.2 (3d ed. 1987); *see also Seaman, supra,* 166 *N.J.Super.* at 474–75, 400 *A.*2d 90 (evidence of lost rental value from new operation incorrectly admitted at trial because, among other things, defendant failed to show that a profit would have been made). In *In re Merritt Logan, Inc.,* 901 *F.*2d 349 (3d Cir.1990), the court predicted that this Court would follow that trend and allow lost profits for a new business if damages were proved with reasonable certainty. *Id.* at 358. That court also relied on comment 2 to *N.J.S.A.* 12A:2–708(2) (UCC), which states that "[i]t is not necessary to a recovery of 'profit' to show a history of earnings, especially if a new venture is involved." *Ibid.* Given that recent trend, the arbitrators cannot be said to have acted in manifest disregard of the law. Thus, because the arbitrators were presented with enough evidence to decide that Sands had proved its lost profit

damages with reasonable certainty, the damage award does not fall.

4. Was it a mistake to award damages greatly disproportionate to Perini's fee?

An excessive or inadequate arbitration award is not grounds in and of itself to warrant judicial interference. Generally, there must be a showing of "misconduct or want of good faith on the part of the arbitrator." *Held, supra,* 136 *N.J.L.* at 642, 57 *A.*2d 20.

Perini argues that a damage award of over $14,000,000 is grossly disproportionate to the $600,000 management fee [3] it was to receive under the $24,000,000 contract and is, therefore, in direct violation of this Court's recent decision in *Dixon Venture v. Joseph Dixon Crucible Co.,* 122 *N.J.* 228, 584 *A.*2d 797 (1991). Perini states that in *Dixon* this Court was concerned with a damage award that was 16% of the contract price (in *Dixon* the contract price and the "fee" were the same), whereas the damages awarded to Sands were 2400% of the fee received by Perini.[4] Put differently, the damage award to Sands was twenty-four times Perini's fee and the damage award in *Dixon* was .16 times the seller's price.

*Dixon* involved liability for the cleanup of property under the Environmental Cleanup Responsibility Act (ECRA), *N.J.S.A.* 13:1K–6 to –13. Generally, under ECRA the seller "will be subject to absolute liability without regard to fault." *Id.* at 232, 584 *A.*2d 797 (citing *N.J.S.A.* 13:1K–13a). Because the seller was not aware of ECRA's requirements when it entered

---

[3]Sands argues that Perini's actual fee was $771,000 because it was to receive 4% of the contract price if the price exceeded $20,000,000. However, in its Appellate Division brief Sands states that Perini's fee for services was $600,000.

[4]Perini's situation is somewhat different from those found in the cases that address disproportionate damages. In most cases, the fee received is the same as the contract price. Here, Perini's construction-management fee was $600,000 and the contract price was $24,000,000.

into the contract, the Court was concerned that the seller might be required to shoulder the entire cost of the cleanup, stating that an "unqualified adoption of either the trial court resolution or the Appellate Division resolution" might produce an "unjust result." *Id.* at 231, 584 *A.*2d 797. We agreed with the Appellate Division that a private right of action could stand under ECRA; however, we found that the problem with that option was that the understanding of the parties had not been taken into account at the time they entered into the contract. *Id.* at 232, 584 *A.*2d 797. Because neither party made an economic choice to assume the market risk—both parties being unaware of the law—an unqualified enforcement of a private right of action would be unfair. *Ibid.* Under those circumstances, we believed that to mold a remedy "in accordance with the economic realities of the situation" was appropriate. *Ibid.* In fashioning a remedy, we instructed the trial court to take into account the "assumptions of each party at the time of closing and whether the anticipated costs of ECRA compliance would be so disproportionate to the sale price that it would have altered the economic choices that the seller would have made." *Id.* at 233.

Perini argues that the "economic realities" of the situation and the assumptions of the parties at the time of contracting should have been considered by the arbitration panel. Specifically, Perini claims that it would not have entered into the contract if it had assumed it would be liable for over $14,000,-000 in damages while receiving only a $600,000 management fee.

This case is not comparable to *Dixon.* In *Dixon,* the seller was not aware of its duties under ECRA, and thus was not aware that it was subject to liability for the cleanup. Also, under the facts in *Dixon,* the buyer could not be held clearly liable either. The buyer had agreed to purchase the property before the effective date of the Act, but the closing occurred after the effective date. Here, on the other hand, the arbitrators had enough competent evidence to determine that Perini was aware of its exposure to liability for lost profits at the time

of contracting. The testimony of Sands's witnesses concerning the seasonal nature of the casino business; the need to finish the project before the start of the summer season; and the fact that Sands would have postponed the project until 1985 if Perini were unable to complete it before the start of the summer season led to the inescapable conclusion that Perini would be liable for failure to complete in a timely fashion.

Perini's second disproportionality argument is based on the *Restatement (Second) of Contracts* § 351(3) (1979) (hereinafter § 351(3)). That section, entitled Unforeseeability and Related Limitations on Damages, states:

> (3) A court may limit damages for foreseeable loss by excluding recovery for loss of profits, by allowing recovery only for loss incurred in reliance, or otherwise if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation. [§ 351(3).]

Based on that section, Perini contends that the doctrine of "disproportionality" allows "a court to avoid extreme unfairness or injustice, by limiting awards of consequential damages, particularly lost profits, in a breach of contract case *even where they are foreseeable.*" Perini argues that even though a consequence may have been foreseeable at the time of contracting, it does not necessarily mean that the parties intended to allocate the risk of loss to one of the parties. That argument tracks comment f to § 351, which in pertinent part states:

> It is not always in the interest of justice to require the party in breach to pay damages for all of the foreseeable loss that he has caused. There are unusual instances in which it appears from the circumstances either that the parties assumed that one of them would not bear the risk of a particular loss or that, although there was no such assumption, it would be unjust to put the risk on that party. One such circumstance is an extreme disproportion between the loss and the price charged by the party whose liability for that loss is in question. The fact that the price is relatively small suggests that it was not intended to cover the risk of such liability.

> \* \* \* \* \* \* \* \*

> [*Restatement (Second) of Contracts* § 351 cmt.f (1979) (hereinafter comment f).]

Perini argues that because the award is highly disproportionate to the fee received, the parties did not intend to allocate the risk

to it. Thus, Perini urges us to follow the Restatement and limit damages.

Although that argument has merit, comment f sets forth several limitations. First, the comment states that damage limitations are "more likely to be imposed in connection with contracts that do not arise in a commercial setting." Second, although it does not appear to be a limitation in and of itself, the comment suggests, through the illustrations that follow it, that a limitation on damages is more likely to be applied where there is an "informality of dealing, including the absence of a detailed written contract, which indicates that there was no careful attempt to allocate all of the risks." That second limitation does not appear to be applicable here because the parties entered into an extensive written contract containing several provisions that addressed damages under certain circumstances. Finally, the section envisions an *"extreme disproportion* between the loss and the price charged by the party whose liability for that loss is in question." (Emphasis added).

Few cases have mentioned § 351(3) in dicta; fewer still have actually relied on that section in limiting damages. Of those courts that have mentioned § 351(3), the disproportion was substantially greater than that found in this case. We note that no New Jersey court has applied that section.

One of the few cases that actually relied on § 351(3) is *International Ore & Fertilizer Corp. v. SGS Control Services, Inc.,* 743 *F.Supp.* 250 (S.D.N.Y.1990). That court looked at the several factors mentioned in comment f and concluded that the damages sought by the plaintiff, which were 16,000 times greater than the contract price, were disproportionate. The fee charged by defendant was $150 and the damages sought were $2,400,000.[5] *Id.* at 257. In reaching its conclusion, the court also relied on the other factors. First, the parties had reached

---

[5]The court noted that the damage award was based on the pleadings and that the actual damages might be much lower.

their agreement over the telephone and the conversation was confirmed by a telex that was devoid of any statement of liability. *Ibid.* Second, the parties' informal dealings and the low contract price indicated that there had been no attempt to allocate all of the risks. *Ibid.* However, the court did allow recovery of fifty percent of the lost profits on a theory of negligent misrepresentation. *Id.* at 258–60.

Perini contends that the disproportionality doctrine has been discussed "implicitly or explicitly" by the New Jersey courts.[6] In *Seaman, supra,* 166 *N.J.Super.* 467, 400 *A.*2d 90, the court refused to allow a damage award that was 207 times greater than the defendant's charge for steel plating. The court reasoned that the loss of profits resulting from the breach had not been foreseeable, explaining that had the defendant anticipated this loss, it would have sought "some assurance that they would not be responsible beyond a stipulated sum." *Id.* at 472, 400 *A.*2d 90. Perini argues that this language suggests that the court was "articulat[ing] a fundamental principle of disproportionality—allocation of risk." Sands argues that there was no implicit disproportionality argument; that in *Seaman* the court simply made the usual foreseeability analysis and determined that an award of lost profits was too speculative because the purchaser had conveyed no information to the seller about its use of the steel plate for "any particular contract or work." *See id.* at 472, 400 *A.*2d 90.

Perini distinguishes *Paris of Wayne, Inc. v. Richard A. Hajjar Agency,* 174 *N.J.Super.* 310, 416 *A.*2d 436 (App.Div. 1980), *certif. denied,* 85 *N.J.* 454, 427 *A.*2d 555 (1981). There the Appellate Division affirmed the trial court's award of

---

[6]In support of that argument Perini relies on the analysis of § 351(3) found in M.N. Kniffin, *A Newly Identified Contract Unconscionability: Unconscionability of Remedy,* 63 Notre Dame L.Rev. *247, 247 (1988), wherein the author cites* Seaman, supra, *166* N.J.Super. *467, 400 A.2d 90, as one of the cases in which a court had attempted to prevent excessive damages under an unconscionability-of-remedy theory.*

$58,900 in damages. Those damages were 200 times the real estate agent's fee of $300. Id. *at 316, 416* A.*2d 436. Perini asserts that the* Paris *court distinguished that case from a case that might arise in a strict commercial setting, stating:*

> If this case were strictly in a commercial context, perhaps the disproportionality between defendants' compensation and their exposure might tilt the scales against an award of consequential damages. But defendants are not just businessmen. They are members of a trained and carefully regulated profession affected with a public interest. [*Id.* at 320–21, 416 *A.*2d 436.]

To be sure Perini does not meet that measure. *See also Kutzin v. Pirnie,* 124 *N.J.* 500, 518, 591 *A.*2d 932 (1991) ("[R]etention of the entire deposit would unjustly enrich the [seller] and would penalize the [buyer] contrary to the policy behind our law of contracts.").

Although Perini's argument that it would not have accepted such a great risk for a minimal fee is forceful, it was well aware of the high stakes involved in the Atlantic City casino-construction industry. By contracting with Sands, Perini offered its expertise in this risky endeavor. At the time Perini and Sands entered into the contract, Perini had managed a number of construction projects in Atlantic City. Considering the nature of this project, Perini might have bargained for a "no damages for delay" clause, see *Broadway Maintenance Corp. v. Rutgers,* 90 *N.J.* 253, 447 *A.*2d 906 (1982), or a liquidated damages clause in the contract. The only plausible conclusion, then, is that Perini left the resolution of a dispute over non-performance to third-party arbitrators. We cannot say that under those circumstances the arbitrators manifestly disregarded any applicable unmistakable principle of New Jersey law.

5. Was it a mistake for the arbitrators to fail to decide an important issue—the question of Sands's wrongful termination of Perini—that was submitted to them by the parties?

■ Finally, Perini argues that the arbitrators failed to address the question of whether Sands had wrongfully termi-

nated Perini. The original proceeding in the Chancery Division was related to that issue. At that time, the Chancery judge found that that issue was arbitrable under the contract and specifically ordered the arbitrators to address it. The clause that the arbitrators were required to interpret states:

> If after substantial completion of the work final completion thereof is materially delayed, the owner shall, upon certification by the [a]rchitect and without termination [of] the contract, make payment of the balance due for that portion of the work fully completed and accepted.

Perini contends that an arbitration award must be set aside if the arbitrators fail to address one of the issues presented to them, citing *Richards v. Drinker*, 6 *N.J.L.* 307 (Sup.Ct.1796). The question in that case was whether the issue of the costs of a previous arbitration proceeding had been submitted to a successive arbitration panel, and, if so, whether it had to decide the issue. The court stated:

> That the award must be according to the submission, and must comprehend all matters therein contained, is a rule laid down as law, by all the authoritative writers upon the subject. * * * [The reason for the rule] is [to fulfill] * * * [t]he object of the parties in making a submission, [that object] is to have a final settlement of every matter comprehended within its terms, and this purpose is defeated when the arbitrators exclude from their consideration and decision any portion of the questions between the parties. [*Id.* at 319.]

*Accord Hazen v. Addis*, 14 *N.J.L.* 333, 336–37 (Sup.Ct.1834).

Perini argues that the arbitrators failed to address the issue of termination either expressly or impliedly. The Chancery Division found that it was implicit in the award; the Appellate Division did not specifically address the issue.

There is authority to suggest that arbitrators do not have to set forth their reasoning expressly on each and every issue submitted.

> [T]here need not be an express finding on each particular point, if all are included either expressly or by necessary implication, for the duty of arbitrators is ordinarily satisfied if they find generally in such a way as substantially to cover all questions embraced in the submission which have been presented to them and not withdrawn by the parties. [5 *Am.Jur.*2d, *Arbitration and Award* § 136 (1962) (footnote omitted).]

*Accord Horne v. Building Comm'n*, 222 *Miss.* 520, 76 *So.*2d 356 (1954).

Here the arbitrators awarded lost profit damages to Sands. The arbitrators could not have found that Perini had satisfactorily performed the contract. A finding that Sands had wrongfully discharged Perini would have contradicted the award. The arbitrators impliedly determined that Sands had properly discharged Perini.

## IV

As were the courts below, we are troubled by the magnitude of this award. One theory of arbitration, particularly in the construction industry, is that a sophisticated corps of arbitrators can cut through the clutter and reach a just result. Parties who genuinely seek arbitration want a " 'final disposition, in a speedy, inexpensive, expeditious and perhaps less formal manner, of the controversial differences between [them].' " *Barcon Assocs., supra,* 86 *N.J.* at 187, 430 *A.*2d 214 (quoting *Eastern Eng'g, supra,* 11 *N.J.Misc.* at 510–11, 167 *A.* 522). They do not simply want three judges. They want three arbitrators with all that that connotes. For those who want a many-tiered review process, it is necessary to preserve those common-law rights. Perini's bitter persistence in challenging this award bespeaks something less than confidence in the arbitral process.

Projects of this magnitude are better left to the agreement reached by the parties in their contract. The theory of lost profits here was most unusual. Sands used its 1985 profits (when it bucked an otherwise declining trend in the industry in Atlantic City) to show what it *would* have earned over the same period in 1984 but for the delay caused by Perini. Our dissenting members, like the dissenting arbitrator below, are not persuaded. The issue, however, is not whether we are persuaded but whether the arbitrators could have been so persuaded without transgressing any of the statutory restraints on

arbitral powers. *N.J.S.A.* 2A:24-8. We find no statutory basis to vacate the award.

The judgment of the Appellate Division is affirmed.

WILENTZ, C.J., concurring.

New Jersey's judiciary was recently given national recognition for its work in the field of complementary dispute resolution—the name used in this state for court-designed alternatives to litigation. The award was given by the Center for Public Resources for our statewide plan for a comprehensive justice center in every county, designed to make alternatives to litigation available for the resolution of disputes. *See Center for Public Resources, Press Release* (January 23, 1992) at 1. New Jersey's judiciary deserves no praise, however, for its treatment of the most effective and most extensively used alternative to litigation—commercial arbitration. Unfortunately, as the record in this case demonstrates, our judiciary's modern history of anti-arbitration bias continues.

In New Jersey, instead of ending the dispute, the arbitration award is just the beginning; in this state, arbitration is not an alternative to litigation but rather the first step of the lawsuit. The parties in this arbitration went through sixty-four days of hearings, involving twenty-one witnesses, resulting in 10,978 pages of transcripts before the arbitrators issued the award that was supposed to end their dispute. Instead, what followed was three-and-a-half years of litigation, first at the trial level, then before the Appellate Division, and now before this Court. The arbitration produced one decision that could fit on two pages. The litigation has produced five judicial opinions, excluding this concurrence, totaling over one hundred fifty pages. The litigation has also produced finality, with this Court's decision today, some three-and-a-half years after the date when arbitration should have produced the same finality. Those three-and-a-half years were spent trying to ensure that the arbitrators' award conformed to New Jersey law despite the

fact that the arbitration agreement contained no such requirement. Indeed, the arbitrators were expressly authorized to grant *any* remedy or relief that was "just and equitable."

The Court's opinion today follows our clear precedents, indeed it attempts to improve them. The problem is that those precedents are wrong. They should be overruled. Their effect is to convert arbitration into litigation by subjecting it to judicial review to see if the arbitrators made legal errors—just as if the arbitrators were judges and the arbitration a lawsuit. We need a new rule, one that is true to our arbitration statute. Arbitration awards should be what they were always intended to be: final, not subject to judicial review absent fraud, corruption, or similar wrongdoing on the part of the arbitrators. Parties who choose arbitration should not be put through a litigation wringer. Whether the arbitrators commit errors of law or errors of fact should be totally irrelevant. The only questions are: were the arbitrators honest, and did they stay within the bounds of the arbitration agreement?

People generally choose arbitration for many reasons: speed, economy, and finality. They trust the process and they trust the arbitrators. Whatever the combination of reasons, the bottom line is the same: they choose arbitration because they do not want litigation. They simply do not want the courts to have anything to do with it. When parties choose arbitration, the role that the judiciary should aim at is to have no role at all. Instead, implicit in our treatment of arbitration has been the notion that justice cannot be assured outside of the courts. It is a notion totally at war with the basic intent of those who submit their disputes to arbitrators. They too want justice, but they look solely to the arbitrators and to the process of arbitration to achieve it. That is their right, and the courts have no right to take it away from them.

Will they get better justice from them? That is not for us to decide. That's their decision to make, theirs alone. When knowledgeable people, experienced in business, decide that they

want arbitrators rather than judges, that they want arbitrators familiar with their business and its customs, arbitrators just as experienced as they are, rather than judges who may have no business experience at all, when they tell us that brand of justice is better for them than ours, we have absolutely no right to tell them that they are wrong.

In advocating that our precedents in this field be overruled, this concurrence seeks nothing radical. New Jersey is not in the majority of jurisdictions with its rule of judicial review of arbitration awards to assure their conformance with state law. If we overrule these precedents, we will join those states that accord finality in fact to the awards of arbitrators. We will abolish a rule and a judicial review that is inconsistent with our statute, with sound public policy, and with the intent of the parties.

I

### "Undue Means"

Our state's modern tradition of overly-intrusive review of arbitration awards apparently has its origin in *Held v. Comfort Bus, Inc.*, 136 *N.J.L.* 640, 57 *A.*2d 20 (Sup.Ct.1948). There Justice Heher explained that "undue means"—one of the statutory bases for vacating an award—is found when the arbitrator intends to decide according to the law but "clearly" mistakes the legal rule, *and* when "the mistake appears on the face of the award or by the statement of the arbitrator * * *." *Id.* at 641–42, 57 *A.*2d 20. Both prongs must be met, because mistakes of law, as Justice Heher explained, should ordinarily not affect the outcome "unless there is a resulting failure of intent or the error is so gross as to suggest fraud or misconduct." *Id.; see also Bell v. Price*, 22 *N.J.L.* 578 (E. & A. 1849) (finding that "[i]f arbitrators mean to decide according to the law, but mistake the rule in some palpable and material point, * * * the award will be set aside as not conformable to their real judgment and intention"); *Collingswood Hosiery Mills v. Ameri-*

*can Fed'n of Hosiery Workers*, 31 *N.J.Super.* 466, 107 *A.*2d 43 (App.Div.1954) (noting mistakes of law reversible only when the "result does not conform to the real judgment of the arbitrators").

*Held* stands in stark contrast with decisions in our earlier history. The earliest arbitration decisions, which were among the first reported decisions of our state's courts, firmly established the rule that arbitration awards would, with few exceptions, be upheld by the courts. *See* James B. Boskey, *A History of Commercial Arbitration in New Jersey, Part I*, 8 *Rut.–Cam.L.J.* 1, 7 (1976) [hereinafter *Arbitration in New Jersey, Part I*]. As Chief Justice Kinsey wrote in *Moore v. Ewing & Bowen*, 1 *N.J.L.* 167, 169 (Sup.Ct.1792):

> I own that I am a great friend to arbitrations; I believe them to be frequently productive of real advantage, and they are not to be hastily or inconsiderably set aside. I approve, in the highest manner, of the liberality with which courts of justice have reviewed their proceedings, particularly in modern times * * *.

Historically, prejudice and misconduct on the part of the arbitrators were the only bases on which courts would void arbitration awards. *See Arbitration in New Jersey, Part I, supra,* at 7. Generally, although modern arbitration legislation does allow limited grounds for vacating an arbitration award, it is well established that an award will not be set aside or vacated for mistakes of law. *American Arbitration Ass'n General Counsel's Annual Report, Arbitration and the Law 1987–88* 32 (1988). In fact, early New Jersey cases explicitly held that mistakes of law would not serve to invalidate arbitration awards. *E.g., Leslie v. Leslie,* 50 *N.J.Eq.* 103, 107–08 (Ch.1892); *Ruckman v. Ransom,* 23 *N.J.Eq.* 118, 120 (Ch.1872); *Smith v. Minor,* 1 *N.J.L.* 19 (Sup.Ct.1790). Those cases recognized that arbitrators are

> the chosen judges of the parties, they are judges of the law as well as of the facts, and are not bound to award on mere dry principles of law, but may do so according to the principles of equity and good conscience. Nor will courts * * * disturb their decisions when made, except upon very cogent reasons. [*Ruckman, supra,* 23 *N.J.Eq.* at 120.]

The arbitrator's overriding duty is not strict allegiance to points of law, but the goal of producing a fair and just decision.

So long as he acts uprightly and impartially, and keeps within the limits of his authority, and deprives neither party of a full and fair hearing, [the arbitrator's] judgments are unimpeachable and irreversible. He may do what no other judge has a right to do; he may intentionally decide contrary to law and still have his judgment stand. [*Leslie, supra,* 50 *N.J.Eq.* at 107.]

The approach permitting judicial reversals for mistakes of law grew out of what was meant to be a minor exception to these otherwise firm rules against judicial intervention in the arbitration process.

[I]f arbitrators mean to decide according to law but mistake the law, in a material respect, and their mistake appears on the face of the award, or they admit it, the award will be set aside because it does not express their real judgment; but in cases where they do not intend to let the law govern their judgment, but to decide according to their own notions of what is just and right, the courts will not interfere, but allow their award to stand. [*Id.* at 108.]

Unfortunately, following *Held,* courts have broadened this otherwise narrow "mistake of law" exception, leading to a steady deterioration of the deference which should be paid to arbitration decisions. This erosion apparently began with *Brooks v. Pennsylvania Manufacturers' Ass'n Insurance Co.,* 121 *N.J.Super.* 51, 296 *A.*2d 72 (App.Div.1972), *modified on other grounds,* 62 *N.J.* 583, 303 *A.*2d 884 (1973). In *Brooks,* the court upheld a trial court's modification of an arbitration award because it was convinced that the arbitrator had "intended to decide [the] case in accordance with applicable law" and then had made a mistake of law. 121 *N.J.Super.* at 55, 296 *A.*2d 72. There was no showing that the mistake of law was so gross as to infect the award and make it unrepresentative of the arbitrator's real judgment; nor was the mistake even shown to be obvious or apparent "on the face of the award." In fact, the *Brooks* court ignored the second prong of *Held* altogether, and held that mere mistakes of law, without more, are a valid basis for reversing arbitration awards. *Ibid.*

Subsequent cases, relying on *Brooks,* have compounded the error, and have opened the floodgates for judicial review of arbitration awards. *E.g., Selected Risks Ins. Co. v. Allstate*

*Ins. Co.*, 179 *N.J.Super.* 444, 451, 432 *A.*2d 544 (App.Div.) (holding that "arbitrators' award will be vacated if * * * mistaken as to applicable law"), *certif. denied*, 88 *N.J.* 489, 443 *A.*2d 705 (1981); *Ukrainian Nat'l Urban Renewal Corp. v. Joseph L. Muscarelle, Inc.*, 151 *N.J.Super.* 386, 400–01, 376 *A.*2d 1299 (App.Div.) (finding that *Brooks* creates presumption that arbitrator will follow "the rule of law" and that award may be reversed on a mere showing, without anything more, of a mistake of law), *certif. denied*, 75 *N.J.* 529, 384 *A.*2d 509 (1977); *Harris v. Security Ins. Group*, 140 *N.J.Super.* 10, 14–15, 354 *A.*2d 704 (App.Div.1976) (ruling that where arbitrator intends to follow law and makes mistake, court may reverse); *Harsen v. Board of Educ.*, 132 *N.J.Super.* 365, 372, 333 *A.*2d 580 (Law Div.1975) (noting that *Brooks* changed settled law, and holding that

> where no affirmative indication exists that the arbitrator was not utilizing the applicable law, or attempting to, and the legal question is *res nova* in this State, the court reviewing the award is to entertain and decide the merits of the legal question involved and evaluate the award's legitimacy against the resolution thereof).

Until today, our Court had not directly addressed this issue. While it is true that in *Brooks* this Court modified the Appellate Division judgment, it did not address the propriety of the lower court's mistake-of-law exception. The same is true for our reversal in *In re Arbitration Between Grover and Universal Underwriters Insurance Co.*, 80 *N.J.* 221, 403 *A.*2d 448 (1979). The only decision of this Court that could be interpreted as equating a mistake of law with undue means is *Perez v. American Bankers Insurance Co.*, 81 *N.J.* 415, 420, 409 *A.*2d 269 (1979), in which the Court hinted that a mistake of law might have been made, but instead found that the arbitrator had made contradictory findings rendering the award invalid as having been procured by undue means. The propriety of the exception was not addressed. Nonetheless, to the extent that *Perez* embraces the mistake-of-law exception found in *Brooks* and subsequent cases, it should be overruled. *Cf. Faherty v. Faherty*, 97 *N.J.* 99, 112–13, 477 *A.*2d 1257 (1984) (vacating

award because arbitrator exceeded his power when, despite parties' agreement to follow New Jersey law, arbitrator granted wife alimony after remarriage).

Although other policy reasons may compel a different result for public sector arbitration, the matter before us falls within the private sector, and we therefore do not address the desirability of a mistake-of-law exception for public sector arbitration. *See Communication Workers of Am. v. Monmouth County Bd. of Social Servs.*, 96 *N.J.* 442, 450–51, 476 *A.2d* 777 (1984); *Kearney PBA Local #21 v. Town of Kearney*, 81 *N.J.* 208, 217, 405 *A.2d* 393 (1979). Nor do we deal with special policy reasons which may have led this Court to note that heightened judicial scrutiny may be required in reviewing arbitration awards affecting child support and custody. *Faherty, supra,* 97 *N.J.* at 110, 477 *A.2d* 1257.

## II

### *Other Jurisdictions*

According to the plurality, an arbitrator's "determination of a legal issue" is to be sustained if it is "reasonably debatable." *Ante* at 493, 610 *A.2d* at 371. Determining whether such an arbitrator's legal conclusion is "reasonably debatable" is a three-step process:

> the arbitrators (1) clearly must have intended to decide according to law; (2) must have clearly mistaken the legal rule and that mistake must appear on the face of the award; and (3) the error, to be fatal, must result in a failure of intent or be so gross as to suggest fraud or misconduct. [*Ante* at 493–495, 610 *A.2d* at 371–372.]

Contrary to the plurality's assertion that it is in the mainstream, *ante* at 494, 610 *A.2d* at 371, the vast majority of jurisdictions have not adopted standards of review as permissive as the three-step process described above. The New York Court of Appeals has expressly stated that "[a]bsent provision to the contrary in the arbitration agreement, arbitrators are not bound by principles of substantive law * * *." *Lentine v. Fundaro*, 29 *N.Y.2d* 382, 328 *N.Y.S.2d* 418, 420, 278 *N.E.2d* 633, 635 (1972) (citations omitted). That the arbitrators intended to decide according to law and may have mistaken the law is

irrelevant; an award will not be vacated even if the arbitrator "misapplies substantive rules of law." *In re Arbitration between Silverman & Benmor Coats, Inc.,* 61 *N.Y.*2d 299, 473 *N.Y.S.*2d 774, 461 *N.E.*2d 1261, 1266 (1984) (cited by the plurality, *ante* at 494, 610 *A.*2d at 371). Simply put, unless the parties expressly state otherwise in their arbitration agreement, mistakes of law do not serve as a valid basis for judicial review, regardless of the arbitrator's intent or any error produced by a failure of that intent. *Lentine, supra,* 328 *N.Y.S.*2d at 420, 278 *N.E.*2d at 635.

In *Pacific Gas & Electric Co. v. Superior Court,* 234 *Cal. App.*3d 428, 277 *Cal.Rptr.* 694, 712 (Ct.App.), *review granted,* 281 *Cal.Rptr.* 765, 810 *P.*2d 997 (1991), the court set forth the general rule that errors of law, even those appearing on the face of an arbitration award, do not justify overturning that award. Instead, only "utterly irrational" legal conclusions will be cognizable; "[i]n these circumstances the appropriate standard of review is whether the construction of the contract presents such an egregious mistake that it amounts to an arbitrary remaking of the contract between the parties." 277 *Cal.Rptr.* at 714.

Other jurisdictions have applied stricter standards for upsetting an award than that adopted by the plurality. *E.g., Department of Parks & Tourism v. Resort Managers, Inc.,* 294 *Ark.* 255, 743 *S.W.*2d 389, 391–92 (1988) (reviewing Uniform Arbitration Act and holding mistakes of law insufficient to overturn an award absent fraud or corruption); *Jackson Trak Group, Inc. v. Mid States Port Auth.,* 242 *Kan.* 683, 751 *P.*2d 122, 127 (1988) (holding that errors of law, without accompanying fraud or misconduct, not enough to set aside arbitration award); *Runewicz v. Keystone Ins. Co.,* 476 *Pa.* 456, 383 *A.*2d 189, 191–92 (1978) (recognizing general rule that arbitrators' mistakes of law not grounds for vacating award absent "showing of denial of a hearing, fraud, misconduct, corruption, or similar irregularity leading to an unjust, inequitable, or unconscionable award"); *Bailey & Williams v. Westfall,* 727 *S.W.*2d 86, 90 (Tex.Ct.App. 1987) (stating that not every error of law warrants setting aside

an arbitration award, but "only those errors which result in a fraud or some great and manifest wrong and injustice").

The plurality's result also conflicts with federal cases analyzing the Federal Arbitration Act. To the extent that federal precedent permits the upsetting of an award because of a "mistake of law," it is an extremely narrow exception to the otherwise strong federal policy against reviewing arbitration awards. *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 *U.S.* 574, 80 *S.Ct.* 1347, 4 *L.Ed.*2d 1409 (1960).

Apparently, the federal "manifest disregard of the law" exception, cited by the plurality, *ante* at 495–497, 610 *A.*2d at 371–373, has its roots in *Wilko v. Swan*, 346 *U.S.* 427, 74 *S.Ct.* 182, 98 *L.Ed.* 168 (1953), in which the Court, in dicta, hinted that "it may be true" that the arbitrator's failure to decide according to applicable statutory law would constitute grounds for vacating the award under the Federal Arbitration Act. *Id.* at 436, 74 *S.Ct.* at 187, 98 *L.Ed.* at 176. Nonetheless, the Court stressed that "[i]n unrestricted submissions * * * the interpretation of the law by the arbitrators in contrast to manifest disregard are not subject, in the federal courts, to judicial review for error in interpretation." *Id.* at 436–37, 74 *S.Ct.* at 187, 98 *L.Ed.* at 176. In other words, when the parties submit the "law" to the arbitrators as the basis for resolving their dispute, "manifest disregard" of that law will justify judicial reversal of the award; however, when the submission is unrestricted, the longstanding federal policy that "[i]f the award is within the submission * * * a court of equity will not set it aside for error either in law or fact" will apply. *Burchell v. Marsh*, 58 *U.S.* (17 How.) 344, 15 *L.Ed.* 96, 99 (1855); *see Wilko, supra,* 346 *U.S.* at 437 n. 24, 74 *S.Ct.* at 188 n. 24, 98 *L.Ed.* at 176 n. 24.

While "manifest disregard" has evolved into an exception, at least two federal circuits have declined to adopt it. *Robbins v. Day,* 954 *F.*2d 679, 683–84 (11th Cir.1992); *Marshall v. Green Giant Co.,* 942 *F.*2d 539, 550 (8th Cir.1991); *O.R. Sec., Inc. v. Professional Planning Assocs., Inc.,* 857 *F.*2d 742, 747 (11th

Cir.1988). Even among those circuits that have recognized such a ground, however, there has been difficulty in drawing a clear-cut distinction between a mere "mistake of law," which is not a ground for disturbing an award, and a "manifest disregard of the law." *Martin Domke, The Law & Practice of Commercial Arbitration* § 25.05, at 261–62 (1968). A manifest disregard of the law will "rarely occur in practice." *Id.* at 262.

These cases confirm that New Jersey is not in the majority in its approach to reviewing arbitration awards. If that is not obvious from the above comparison of the standards of review, it becomes clear on examining the plurality's application of its own standard. The arbitrators here are judged not as experts in the construction industry seeking an equitable solution, but rather as learned jurists applying intricate issues of law. *See ante* at 497–516, 610 *A.*2d at 373–383. This result clearly conflicts with the underlying goals and strengths of arbitration.

The history of legal rules, like the rules themselves, is neither precise nor certain. The historical pattern in this instance, however, is reasonably clear. Until 1948, New Jersey generally accorded finality to arbitration awards regardless of mistakes of law; following *Held,* however, we have, under a variety of rule formulations, imposed judicial review of arbitration under standards that allow vacation of awards for errors of law, although the scope of the review and the extent of the error is far from clear. At the same time, most of the country has eschewed this approach, adhering to the earlier rule of our state that absent fraud, corruption, or other similar wrongdoing, an arbitrator's award will be upheld regardless of any such errors.

## III

### *The Plurality's Rule: Unworkable and Unjustifiable*

The justification in *Held* and subsequent cases for the present rule of judicial review and vacation of arbitration

awards for "gross legal errors" is that such awards fail to effect the intent of the arbitrators. *E.g., Held, supra,* 136 *N.J.L.* at 642, 57 *A.*2d 20 (stating that a mistake of law is not fatal "unless there is a resulting failure of intent"). The rule is expressed as authorizing vacation of the award only if the arbitrators intended to decide in accordance with New Jersey law and then only if they clearly failed to do so. *Collingswood Hosiery Mills, supra,* 31 *N.J.Super.* at 469, 107 *A.*2d 43. We have made the rule applicable to practically all arbitration awards through the presumption that in the absence of any agreement to the contrary, the arbitrators intended to apply New Jersey law. *See In re Arbitration Between Grover and Universal Underwriters Ins. Co., supra,* 80 *N.J.* at 231, 403 *A.*2d 448 (concluding that arbitration award was invalid and applying New Jersey law to remedy award); *Ukrainian Nat'l Urban Renewal Corp., supra,* 151 *N.J.Super.* at 400, 376 *A.*2d 1299 (noting that arbitrators are presumed to intend to apply New Jersey law). Since parties practically never express any intention whatsoever on this subject in their arbitration agreements, their true intent being that the arbitrators will decide what is just and equitable without regard to *any* state law, it is rare that there is any "agreement to the contrary," indeed, rare that there is any agreement at all that mentions state law.

The flaws in the current rule are obvious. Presumably the touchstone of the rule is whether the award truly reflects the arbitrators' intent. If, however, the arbitrators did indeed intend to decide in accordance with law, they probably intended only to exercise their best judgment and knowledge in resolving the legal issues without at all intending to have their award fail if some judge later says they erred. More than that, if their intent was that their award should have validity *only* if decided in accordance with New Jersey law, it is unlikely that they would want it to fail only if they were grossly mistaken, their failure of intent being not one whit less when it is debatable. In both cases there is precisely the same failure of intent: they intended to decide in accordance with New Jersey law and they

did not. In that regard their failure of intent is no different from that of a trial judge whose learned, persuasive, and reasonably debatable decision is reversed by this Court: he intended to follow the law but he did not.

The incorrectness of the analysis on this point by the plurality, and by our prior cases, goes deeper; indeed, it goes to the heart of the problem. The issue is not what the arbitrators intended and whether or not their decision reflected that intent, but rather what the parties intended to commit to arbitration and what *they* intended to subject to judicial review. *See Kearney Pba Local No. 21, supra,* 81 *N.J.* at 217, 405 *A.*2d 393 (stating that source of arbitrator's power is the agreement and that arbitrator must comply with the authority the parties have given him or her in the agreement). If the parties intended the arbitrators' decision to be final and not subject to judicial review—so long as it was honest—it matters not whether the arbitrators intended or did not intend to decide in accordance with New Jersey law or that, if they did, whether they erred. *Ibid.* (stating that "parties may authorize the arbitrator to determine legal issues as he deems fit irrespective of whether those determinations are in accordance with the law"). All of those questions of "arbitrators' mistakes" and "failure of intent" are subsumed in the critical question: what judicial review, if any, did the parties intend, or expressed differently, did the parties want the arbitrators' award to be vacated because of such alleged "failure of intent?" It would indeed be strange if they did, strange if their affinity for New Jersey law was so strong that, despite their selection of arbitrators in place of the judiciary, they would declare the arbitration a nullity for gross errors in such law, yet be content with the most prejudicial errors of law just so long as they were debatable.

The analysis that examines the arbitrators' intent is totally irrelevant if the correct rule is that the parties are legally free to completely insulate the arbitrators' decision. I believe they are, indeed, I believe the statute itself achieves that result.

Review based on errors of New Jersey law, or *any* law, is justified only if the parties so intended. That intent is so unlikely, so opposite to the ultimate goal of arbitration, as to require its explicit expression in order to justify such consequences. A similar analysis would apply to errors of fact.

A further reason given to justify the "gross error of law" rule is that it significantly diminishes what would otherwise be excessive judicial intrusion into the arbitration process. *Ante* at 494, 610 *A*.2d at 371. In other words, it is justified by comparing it with a straw man—comparing it with a system that would allow judicial review and vacation of the award if *any* legal error was committed. Obviously, that reasoning is correct, if that is the only comparison that can be made—certainly the present rule, no matter how bad, is better than one that would vacate arbitration awards for any error of law. The "gross error" rule, however, is fundamentally unworkable. Try as it may, the plurality finds it exceedingly difficult to define what is meant by a "gross error of law." *See ante* at 515–516, 610 *A*.2d at 382–383. Its praiseworthy attempt to do so simply underlines the difficulty of the task, and its result is an unfortunate plethora of inconsistent formulations that because of the nature of the matter provide less than helpful guidance. The rule purports to distinguish legally erroneous arbitration decisions which will be sustained, from grossly, or clearly, or indubitably, erroneous arbitration decisions which will not. Judges are not adept at making such distinctions. Indeed in this case itself, three judges conclude that there is no gross error and sustain the award, while two others, convinced of the enormity of the arbitrators' legal mistake, would not simply vacate the award but would replace it with their own, a substitute that reduces the original by over four-and-a-half million dollars. *See ante* at 524–525, 610 *A*.2d at 387.

Judges sometimes experience considerable difficulty in deciding what is wrong; our uncertainty would escalate were we required to decide what is very wrong. The concept of degrees of legal wrongness is foreign to us, it is not our stock-in-trade.

Certainly, in some cases where legal error is asserted, courts are quite capable not only of recognizing the error, but of characterizing it as, for example, either gross or debatable. Unfortunately, however, there are many cases, as here, where that distinction is not easily made. We sometimes characterize those who disagree with us in terms that suggest their errors are flagrant, not just gross, including the errors of our colleagues when we split four-to-three. And when we unanimously conclude the trial court was wrong, we often suggest the question was not only debatable but extremely close. Indeed, it is rare that the characterization makes any difference. What counts is whether the error was prejudicial, not whether it was clear, gross, or close. Furthermore, in most cases we have no standard other than the strength of our own convictions for whether an error is clear. Often it is not at all clear to one Justice that there *is* an error, while three others are convinced the error is crystal clear, and the other three convinced that beyond doubt there was no error. If you add to these difficulties concerning legal error those that will face judges trying to characterize factual error, the picture of an unworkable system of judicial review of arbitration awards is clearer.

When the justification offered for the rule is that it minimizes judicial interference with arbitration (as distinguished from the "failure of intent" justification), a different analysis demonstrates not only its unworkability but it failure to achieve its implicit goal: to give the parties the presumed benefit of New Jersey law and the benefit of a decision that conforms to that law. Otherwise why have any such rule in the first place? But if that is the purpose of the rule, why then should we deprive those who lose their rights through the arbitrators' legal error of a remedy, just because the error is not crystal clear?

In all appeals of all litigants before us where we reverse for legal error, we do so in order to give them their legal rights. I can recall no case in which we said the appellant is right, the judge was wrong, the error is prejudicial, but we will not reverse because the judge was not grossly wrong. What

justification is there to allow some arbitrary number of legally-incorrect arbitrators' decisions to stand, but vacate a lesser number because the legal errors are gross? If fairness and justice are uniquely found in New Jersey law, we have devised a rule that assures injustice to the majority, a rule we would never apply to litigants in the courts.

Obviously, the rule, when diminished judicial review is given as the justification, represents a balance between one's sense of justice—assuming one believes that only New Jersey law brings justice—and one's sense of the need for finality in arbitration. The irony in relegating those whose rights have been defeated by legal error to no remedy, while vindicating others when the error was gross, is that the former may have been much more grievously damaged by the error. None of the cases suggests that "gross error" relates to anything other than the extent the error departs from the correct rule; put differently, none of the cases suggests that the "grossness" is measured by the ultimate impact on the parties.

Given diminished judicial interference as the justification for the rule, I believe that the balance struck is wrong. If, in order to protect arbitration from judicial review, we are willing to sustain legally erroneous awards that are debatable, we should sustain even those relatively few that are clearly legally erroneous.

Even the admitted benefit of the "gross error" rule, beneficial only when measured against the even worse rule of unrestricted review and not a benefit at all when measured against what I contend is the correct rule, is minimal, indeed uncertain. If that benefit is thought of as the greater certainty or likelihood of finality, the greater confidence of the parties in the award's finality, or the shorter period of time that must elapse before the fact of finality is determined, that benefit is seriously diluted. It will be the rare event when any party's lawyer will predict with confidence the outcome of a case in which one party has appealed to the judiciary from an arbitrator's award

on the ground of "gross legal error." And it will take just as long to dispose of those cases on appeal as it would if *all* errors led to vacation of the arbitrator's award. For every case in which the appellate court quickly finds the error was "undebatable," there will be many others that require not only the usual effort to determine if there was error at all but also to determine if that error was gross. Inevitably that supposedly pure legal determination—gross error or simple error—will be influenced by a factor not explicitly credited—the overall sense of justice or injustice in the outcome.

Finality in the sense of ultimately sustaining the award may be minimally served by the "gross error" as compared to the "ordinary error" rule, but finality in the sense of getting it over with during one's lifetime may not be. A dispute will be resolved, in fact and appearance, as is the case here, not by arbitration but by litigation.

The practical difficulty of determining legal error in arbitration awards is formidable. *See Advest, Inc. v. McCarthy*, 914 *F.*2d 6, 10 (1st Cir.1990) (noting that arbitration does not require a record and that without a record parties have little chance of meeting the standard required to vacate an arbitration award). The highly refined distinction between legal error and gross legal error requires the existence of all of the trappings that appellate judges are used to: a stenographic record, a transcript, objections and rulings, applications and requests by counsel prior to, during, and after trial, numerous rulings by the court, often accompanied by opinions, briefs containing factual and legal contentions and detailed argument in support of both, and finally the judgment of the court supported by written findings of fact and conclusions of law. Absent any of these, the identification of legal error becomes even more difficult. Arbitration does not require a record; neither the statute nor, in this case, the applicable rules selected by the parties (Construction Industry Arbitration Rules) requires even a stenographer. *Cf.* American Arbitration Association *Rule* 50 (stating that "the cost of the stenographic

record, *if any is made,* and all transcripts thereof, shall be prorated equally between the parties ordering copies") (emphasis added). To apply the plurality's rule without such a record would require, at a basic minimum, the re-creation of the proceedings, the evidence, everything—in this case the re-creation of sixty-four days of hearings.

The rule, of course, could be that legal error will not be considered in the absence of a record, but that suggests a double standard and imposes on the parties a cost that they may want to avoid in their pursuit of an allegedly less expensive method of resolving their dispute. The fact that arbitrators do not have to give reasons when they make their rulings, not even reasons for their ultimate decision, compounds the difficulties of identifying legal errors. And if, as I assume is the case, the critical question is not simply whether there was legal error but whether it was prejudicial, confusion is compounded. The "plain error" doctrine (*Rule* 2:10–2) would likely apply in order to achieve the purposes the doctrine serves in litigation (assuring error-free proceedings by penalizing those who fail to alert the court to error by claiming it). *See Barcon Assocs., Inc. v. Tri–County Asphalt Corp.,* 86 *N.J.* 179, 195, 430 *A.*2d 214 (1981) (stating that should arbitrator make full disclosure, failure to object deemed waiver of any later right to object). Application of both the "harmless error" (*Rule* 1:7–5) and "plain error" doctrines becomes impossible with no record, and even with a record borders on the impossible if the arbitrator simply refuses to rule on motions. For instance, if an arbitrator, in response to an objection to the introduction of evidence, allows its introduction but refuses to say whether or not he will consider it, explicitly reserving that right, one will never know if the arbitrator erroneously considered the evidence, or if such consideration was prejudicial.

In this case after four years and sixty-four days, the arbitrators simply awarded $14 million to Sands without any explanation whatsoever other than a finding that Perini had "failed to properly perform its obligations as construction manager pur-

suant to the contract * * *." There are no reasons, no findings of fact, no conclusions of law, nothing other than the foregoing. For all we know, the arbitrators concluded that the sun rises in the west, the earth is flat, and damages have nothing to do with the intentions of the parties or the foreseeability of the consequences of a breach.

To the extent that it suggests it is sustaining the legal correctness of the arbitrator's decision, the conclusions of the plurality on the various questions discussed in its opinion, that there was both sufficient evidence to sustain certain findings of fact and sufficient legal authority to warrant certain conclusions of law, is an invention, pure and simple. The arbitrators made absolutely no findings of any kind, factual or legal. If an appellate court faced such a record and was asked to decide whether legal error existed, it would refuse to do so, for it would find the task impossible in the absence of judicial rulings, judicial findings, and judicial conclusions, all with supporting reasoning. Instead, the appellate court would promptly remand the case to the trial court and direct it to make findings of fact and conclusions of law.

Given the possibility of a total absence of any record, and the even more likely possibility of a judgment without findings of fact or conclusions of law, the rule cannot practically be applied at all in a substantial number of cases. The obstacle to recreating the record is obvious, especially in an arbitration that is protracted; difficulties of requiring findings of fact and conclusions of law after the award is rendered is in reality no less formidable. Besides trying to get the arbitrators to meet again, the truth may be that there never were any findings of fact or conclusions of law, there was simply a decision. The impact of these deficiencies on the rule espoused by the plurality is devastating. This analysis applies with equal force to the rule that arbitration awards will be vacated for "gross errors of fact."

The plurality's opinion is instructive on the consequences of the search for legal error where no findings of fact or conclu-

sions of law exist. Those consequences flow inexorably from the logic of the situation—they are not some unusual result of the plurality's reasoning. The reviewing court is forced to deal with practically every conceivable contention of error claimed by the losing party, forced to try to figure out if there was some way the arbitrators could have reached the conclusion they did when confronted with such a claim of error. It is not enough to do what is ordinarily done on appellate review, namely, to identify the basis for the court's decision and then rule on it, for we do not know the basis for the arbitrator's decision. We ask the question, as if it will admit of an answer, whether there was "some evidence" to support the conclusion, whether there was "sufficient evidence" to sustain the award. The question is almost meaningless since we will not know the basis for the arbitrator's decision. The conclusion that there is "some evidence" or "sufficient evidence" is not one made in the abstract; it relates to the quantum and quality of evidence to support a certain legal theory, to support certain legal conclusions, it relates to the sufficiency of the evidence to make those findings of fact that will support those legal conclusions. If one does not know what the conclusions of law were, and one does not know what the conclusions of fact were, it is, in most cases, impossible to address the question of whether the evidence was sufficient.

## IV

### The Effect of the Rule

The potential effect of the plurality's rule is apparent from this case. If the stakes are sufficient, it invites the losing party to attack the arbitration award in court, thereby delaying its finality for unpredictable periods of time, here around three-and-a-half years. Accompanying that consequence is the added cost to the parties, undoubtedly most substantial in this case. I am unaware of the existence of any statistics in New Jersey concerning the percentage of arbitration cases now appealed.

My impression is that appeals from arbitrators' determinations are not numerous. They do occur, however, and when they result in an opinion of the kind rendered today by the plurality, there must be concern about the substantial impact on the arbitration process. Whatever doubt on the score may have existed before, it is now crystal clear that a party to an arbitration can obtain vacation of an award if able to persuade a court that gross legal error existed. When motivations for delay exist, appeals to the judiciary are encouraged, and, since hope springs eternal in the advocate's breast, one can expect the number of such appeals to grow. How the Court will rule on the question of recreating a record, or on compelling arbitrators, post-arbitration award, to make findings of fact and conclusions of law I have no idea. But that there will be a further dilution of the effectiveness of arbitration as a remedy I have no doubt. If the bottom line purpose of arbitration is to keep the courts out of one's disputes, the attractiveness of the remedy is seriously diminished by the plurality opinion. Even if the impact turns out to be minimal—which I doubt—the opinion will have its greatest effect on the cases of the most importance: cases with significant financial or other consequences. Even if a relatively small number, those cases at least will lose the benefits the parties initially sought through arbitration: finality, speed, and certainty. One can imagine a party wondering whether arbitration should even be attempted since arguably the case would have been concluded sooner if it had originally been started with the judiciary.

Finally, the effect of the rule, to a greater or lesser extent, is not only to deprive arbitration awards of their finality, but potentially to deprive the parties of the awards of the arbitrators. For certainly in some instances an arbitration award will be vacated for reasons never intended by the parties. The dissent, however, argues that judicial superintendence is needed; that without it arbitrators' decisions may be "off the wall." *Post* at 556, 610 *A*.2d at 403. Obviously the potential cost of that point of view, in every arbitration case, is the cost in this

case: after three-and-a-half years, three justices conclude that the arbitration award was not off the wall and two disagree. All five, however, continue the bias reflected in our precedents: we have to protect the business community from the arbitrators they have selected, the arbitrators they trust. We must review their decisions to make sure that they have not made a bad mistake; we must protect the business community from the risks of the speed, finality and economy that they sought from arbitration, even if it costs three-and-a-half years of delay and no one knows how much in legal fees. Bluntly, though the businessmen who selected these arbitrators may not know it, we are superior. And in the long run, according to the dissent, the business community will select arbitrators more readily with this rule, they will select arbitrators more readily when they are assured that, if needed, the courts will decide the matter. That's really why they chose arbitrators—to get the ultimate protection of judges.

Ultimately, the question is whether the effect of the plurality rule would be reversed were we to impose the rule suggested by this concurrence. Such a rule would insulate arbitration awards from all judicial review in the absence of fraud, corruption, or similar wrongdoing. Quite clearly it would achieve finality, in a way that the plurality's rule cannot. Recourse to the courts would be almost nonexistent, just as fraud, corruption, or similar wrongdoing is almost nonexistent in arbitration. When there was recourse, summary judgment would be swift and sure if the attempt to gain judicial review lacked substance and was really designed to delay, for it is most difficult to make any showing of fraud or corruption on affidavits unless there is real substance to the claim.

V

*The Rule's Conformance, or Non–Conformance, to*
*Public Policy, Statute, and the Parties' Intent*

For the purposes of this case, this opinion has already adequately treated the question of public policy. There is no public

policy of this state supporting the notion that arbitration would be better served by judicial review of arbitration awards to see if they conform to New Jersey law. The public policy of this state supports arbitration as a method of resolving disputes. *See N.J.S.A.* 2A:24-1 to -11. It does so because of the speed, economy, and finality of arbitration and arbitration awards. *See Barcon Assocs., supra,* 86 *N.J.* at 187, 430 *A.2d* 214. Unfortunately, the plurality's rule dilutes each one of those three factors to some extent.

The significance of the public policy favoring arbitration has been heightened in fact and in public perception in recent years as we understand the cost of litigation, not only to the parties but to society. *See Pacific Gas & Elec., supra,* 277 *Cal.Rptr.* at 712 (stating that "[t]he judicial process grinds exceedingly fine as to questions of law. * * * A principle reason for selecting arbitration is that the costs of using [these] exceedingly fine wheels are thought not worth the additional assurance afforded by the judicial process").

Every alternative to litigation must be examined, pursued, and enhanced, and if there is any alternative that has proven itself, it is commercial arbitration. The import of the plurality's opinion goes beyond commercial arbitration, but it is sufficient for public policy purposes to note its potentially serious impact in that area. With annual case filings now over a million per year, having increased more than fifty percent in the last ten years, and with delay in civil litigation approaching catastrophic proportions, we need to reinforce arbitration as an effective remedy, as it was intended to be. We need no rule now imposing judicial restraint on arbitrators, but rather one that imposes restraint on the judiciary.

Perhaps the best demonstration of the failure of the rule adopted by the plurality—and by our prior precedents—to conform to the statute is the statute itself. *N.J.S.A.* 2A:24-8 and -9 provide as follows:

The court shall vacate the award in any of the following cases:

a. Where the award was procured by corruption, fraud or undue means;

b. Where there was either evident partiality or corruption in the arbitrators, or any thereof;

c. Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause being shown therefor, or in refusing to hear evidence, pertinent and material to the controversy, or of any other misbehaviors prejudicial to the rights of any party;

d. Where the arbitrators exceeded or so imperfectly executed their powers that a mutual, final and definite award upon the subject matter submitted was not made.

When an award is vacated and the time within which the agreement required the award to be made has not expired, the court may, in its discretion, direct a rehearing by the arbitrators. [*N.J.S.A.* 2A:24–8.]

The court shall modify or correct the award in any of the following cases:

a. Where there was an evident miscalculation of figures or an evident mistake in the description of a person, thing or property referred to therein;

b. Where the arbitrators awarded upon a matter not submitted to them unless it affects the merit of the decision upon the matter submitted; and

c. Where the award is imperfect in a matter of form not affecting the merits of the controversy.

The court shall modify and correct the award, to effect the intent thereof and promote justice between the parties. [*N.J.S.A.* 2A:24–9.]

By any fair reading, section 8a, the source of the "undue means" rule, defies the plurality's construction. The idea that "corruption, fraud or undue means" could be converted into a rule that reverses awards for errors of law would be unthinkable if viewed anew. More persuasive than subsection a, however, is the thrust of that entire section. It refers to those cases that will result in the arbitration award being *vacated*, not changed, not corrected, but rejected. As defined by the statute, they are cases with deficiencies that go to the heart of the integrity of any dispute-resolution process, whether arbitration or judicial.

The first two subsections deal with partiality, corruption, fraud, or similar wrongdoing; their significance is self-evident. *N.J.S.A.* 2A:24–8a to –8b. The third subsection deals with the deprivation of a fair hearing, so grievous as to be characterized not as a mistake but as "misconduct"—refusing to postpone a hearing, refusing to hear evidence, or any other "misbehaviors" prejudicial to the rights of any party. *N.J.S.A.* 2A:24–8c. The

fourth subsection deals with an arbitration award that is so unresponsive to what was submitted by the parties that it could not even be considered "mutual, final, and definite." *N.J.S.A.* 2A:24–8d.

It is simply impossible by any fair reading to square these clauses and their unique consequence—vacation of the award—with the notion that the same consequence should follow because someone made a mistake of law, or an error of fact. The statute does not provide for a remand back to the original arbitrators to correct the error; indeed, there is not even a referral back to start all over again. The matter is over, complete, any further proceedings totally dependent on the will of the parties. It may even be that the agreement to arbitrate is of no further force and effect once the initial arbitration award has been vacated.

That conclusion—and more—is underlined and emphasized by section 9, which authorizes the court to "modify or correct the award"—not vacate it, in certain limited cases. *N.J.S.A.* 2A:24–9. The most obvious consequence of sections 8 and 9 is their implicit limitation on the power of courts when "undue means" is asserted: the court is powerless to "modify or correct the award," given the clear distinction between the vacation of the award authorized by section 8 and the modification or correction authorized by section 9. More than that, some idea of the extreme limitation intended by the statute on judicial review is suggested by section 9. You can "modify or correct" not for errors of fact, or gross errors of fact, but only "where there was an *evident* miscalculation of figures, or an *evident* mistake in the description of a person, thing, or property referred to therein." *N.J.S.A.* 2A:24–9a (emphasis added). The difference between that extremely limited scope of mistake allowing only for modification, and the notion that an award can be vacated for gross errors of any fact is obvious.

The second case in which modification or correction is allowed occurs when the "arbitrators awarded upon a matter not sub-

mitted to them unless it affects the merit of the decision upon the matter submitted." *N.J.S.A.* 2A:24-9b. In other words, when arbitrators decide something that no one asked them to decide, unless they had to do so in order to decide that which was submitted, the modification or correction would presumably be the excision of that matter from the award. The last subsection, finally, allows for the modification or correction of matters of form. *N.J.S.A.* 2A:24-9c.

The two sections put together persuade me not only that "undue means" has nothing to do with errors of law but that the scope of judicial review was intended by the Legislature to be extremely narrow. Section 9, concerning modification or correction of awards based on factual errors, is extremely limited. Therefore, the only tenable conclusion from the statute itself is that errors of fact, whether gross or ordinary, lead to neither vacation nor modification and correction. More to the point in this case, there is no mention whatsoever of errors of law. The statute provides no remedy whatsoever for that alleged mistake.

The rule of our precedents caught at least some part of the spirit of the present statute: the "errors of law" had to be so egregious that one need only look at the cover page, at the award, to know that a horrible mistake had been made. It should take you no more than a minute to know that the arbitration award had to be vacated. While not strictly analogous, it suggests a deficiency similar to those in section 8, something so horrible that without getting involved at all with the merits of the proceeding, with the thousands of pages of transcripts that we have in this case, one could say that there was fraud or corruption or some similar wrongdoing that requires vacating the arbitrators' award.

The rule of the plurality and of our precedents fails to accord with the intent of parties to arbitration. The very purpose of committing a dispute to arbitration is to get away from the judiciary, to get away from the strictures and limitations of

law, to get away, in this case, from New Jersey judges and New Jersey law. It is not that the parties would object if arbitrators thought it appropriate to consider New Jersey law, it is that they absolutely do not want to require them to.

This was a "blue ribbon" panel, a special panel reserved for construction disputes. The parties specifically required that such a panel be selected, and presumably knew that construction-industry arbitration under the American Arbitration Association (A.A.A.) required only that the arbitrators render such an award as is just and equitable.

In most cases, as in this one, all the parties want from the arbitrators is honesty and an attempt to reach a fair and just result, and what they rely on is not only the arbitrators' honesty but, as in this case, the depth of their experience with the kinds of problems put before them. I am not suggesting that that is their intent in *every* case, but that it is most probably their intent in practically all cases.

It is incongruous to think that parties who want to get out of the court system, who want to avoid litigation, somehow want their awards to be reviewed on the basis of their conformance to New Jersey law. A party that wants arbitration but also wants New Jersey law to apply would say so. In many cases, the parties to a dispute have interests outside of this state, are used to the laws of other states, are used to laws as interpreted by federal courts, and most of all are used to arbitrators throughout the nation. The notion that somehow they want New Jersey law, in that respect, is also discordant with the probable expectations of the parties. The presumption enforced by our cases is just the opposite of what it should be, namely that if nothing is said in the agreement, the arbitrators may use any standards they want to reach a just and equitable result, unrestricted by any law or laws, required only to be honest and to attempt to the best of their ability, based on their knowledge and experience, to achieve a just and equitable result.

If, however, the unlikely intent is the fact, and the parties really *do* want New Jersey law to apply, and they really *do* want their award to be reviewable for gross errors of New Jersey law, they must say so in their agreement.

If it be contended that our prior decisions are such as to have put parties on notice that their silence will be construed as an intent that the parties apply New Jersey law and that their award be reviewable for errors in that regard, my response is based partly on my own experience and partly on the sense of the situation. The law was never all that clear, this Court having never so clearly pronounced its views as it does in this opinion, and my belief is that as a result thereof, parties to an arbitration agreement, clearly committing their dispute to arbitrators in order to avoid the courts, would not possibly believe that the law in this state was such as to result in a rule that required the arbitrators to apply New Jersey law and a further rule that made their award reviewable for errors in interpreting that law. It simply does not make sense.

## VI

### *The Plurality Opinion's Improvement of the Existing Rule*

It is clear that the plurality is acutely aware of the potential damage to arbitration that could be caused by the existing rule if it is improperly understood and administered. For that reason, the plurality goes to great lengths in stressing the highly restricted nature of judicial review. I believe that the plurality's opinion may effect some improvement in the rule compared to what a scholar might have concluded it was before this opinion. Unfortunately, that improvement is more than cancelled by the fact that this Court has now unambiguously adopted the existing rule, albeit with some slight change in emphasis. If any doubt existed before, it is now gone: arbitration awards are reviewable by New Jersey courts for errors of law, however one may want to define the limitations.

The problem faced by the plurality opinion is not of its making, but rather is traceable to our precedents. It follows those precedents: "gross errors of law" will result in a vacation of the award. The problem is defining what "gross errors of law" amount to. The task is formidable, and the numerous formulations in the plurality opinion attest to that fact. The formulations include: "gross, unmistakable, or in manifest disregard of the applicable law," *ante* at 484, 610 *A*.2d at 366; "wholly bereft of evidential support," *ante* at 491, 610 *A*.2d at 370; "interpretation of the contractual language is reasonably debatable," *ante* at 494, 610 *A*.2d at 371; "interpretation of law is reasonably debatable," *Ibid.;* "interpretive error that may be characterized on its face as gross, unmistakable, undebatable, or in manifest disregard of the applicable law and leading to an unjust result," *ante* at 496, 610 *A*.2d at 372; "arbitrators manifestly disregarded any applicable unmistakable principle of New Jersey law," *ante* at 492, 610 *A*.2d at 370. I confess that I do not know which rule, or which formulation of the rule, the plurality opts for, nor do I understand, regardless of which it is, how it is to be applied. There are several things that are clear, however: the first is that we are retaining the rule that presumes the parties intend that arbitrators be bound by New Jersey law; the second is that the arbitration award can be vacated for gross errors of law; the third is that they need be only "errors," since there is no requirement in the plurality opinion, as there is in various out-of-state and federal cases, that the arbitrators be fully aware of the clear rule of law and intentionally disregard it; and the fourth is that there is no requirement that the error be instantly, immediately, and obviously apparent, or that it indeed appear on the "face of the record."

I will not attempt to analyze each of the plurality's formulations. As noted, they differ substantially from those used in other jurisdictions. In fact, the plurality's quotation from *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 *F*.2d 930 (2d Cir.1986), *ante* at 496, 610 *A*.2d at 372, indicates that the Second Circuit's formulation is substantially different

from the plurality's. It requires that the error must have been "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." 808 *F*.2d at 933. It requires that "the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it." *Ibid.* In other words, the court must find blatant and intentional disregard of the law, so horrendous that it is instantly perceived. This standard is quite different from that of the plurality, which, I gather, adds up to reversal only when the mistake of law is not reasonably debatable. The bounds of the rule allowing vacation of awards by the courts have never been clearly defined, and I suggest that the plurality has not moved us much closer to a definitive formulation, and that to the extent it has, it is the wrong definition.

As far as I am concerned, the formulations of the plurality are not helpful and leave us substantially where we were—judges searching a record to determine not whether there were "gross errors of law" or "manifest disregard of the law," but rather whether there were any errors of law at all. Presumably, once you find them, you try to figure out, using what standard I do not know even now, whether they were "gross" or "instantly recognizable." You certainly do not try to psychoanalyze the arbitrator to see if he clearly knew what the law was but intentionally disregarded it. Nor do you worry about what appears on the face of the record, you read the entire transcript. It is crystal clear from the methodology used by the trial court, the Appellate Division, and especially the plurality that the search starts for errors of law, and in this case ends with it, without worrying about how serious the error might be. Judge Gibson's trial court opinion reflects a thorough review of the entire record and is based mostly on an assumption of what the law probably is, accompanied by a perceptive analysis of the facts. The Appellate Division's opinion reflects more concern for propositions of law that the arbitrator presumably followed. But above all, the plurality's opinion tells us what this rule really amounts to; for in the end what we do is functionally,

analytically, and in reality not one bit different from what we would have done if instead of arbitrators, this case had initially been decided by the trial court.

The plurality deals with several questions, and for each one it conducts a factual and legal analysis and marshals all of the applicable authorities in exactly the same way as learned jurists would do when reviewing lower court decisions. It cites recognized and authoritative text on the legal issues involved; it examines the thrust and intent of various portions of the Restatement of Laws; it carefully relates the significance of different factual contentions to the propositions of law involved; it notes the unperceived uncertainties in the various rules concerning the award of lost profits; it not only has every modern authority that is relevant, it grinds back to *Hadley v. Baxendale*, 9 *Ex.* 341, 156 *Eng.Rep.* 145 (1854), *ante* at 497, 610 *A*.2d at 373; if the general common law is not sufficient, it notes *Siegfried, ante* at 502, 610 *A*.2d at 375; it cites authorities most judges have never heard of (*Sweet, ante* at 500, 610 *A*.2d at 375 and *Stein ante* at 501, 610 *A*.2d at 375); it stands poised to reverse if substantial completion had occurred by a certain date, but finds the arbitrators might have found that it occurred later—as if this would not have been a "reasonably debatable" mistake of law, *ante* at 500–501, 610 *A*.2d at 374–375; it deals with the complexities of awarding lost profits to a business that has not been in business before and cites the Uniform Commercial Code on that issue; *ante* at 509, 610 *A*.2d at 379; it analyzes *Dixon,* including inquiring into what the parties in that case may have contemplated, *ante* at 510, 610 *A*.2d at 380; and, finally, it notes that no New Jersey court, and only a federal court in the Southern District of New York, has interpreted the *Restatement (Second) of Contracts* § 351(3) (1979), *ante* at 512, 610 *A*.2d at 381.

While it does not say so, the plurality's conclusion seems to be that the arbitrators may have made no errors of law whatsoever, to say nothing of any gross errors of law. What is even more self-evident is that the review necessitated by the rule is indistinguishable from ordinary appellate review. Its implication is that if error of law were to be found, it would not be

much of a distance to travel to conclude that it was "gross" or "not reasonably debatable" even if it may take a long time, a lot of hard work, enormous research, to reach the conclusion that no one could reasonably debate it.

This is not what the parties bargained for. They explicitly agreed that any dispute under their contract should be resolved by arbitration in accordance with the Construction Industry Arbitration Rules of the A.A.A. *Rule* 43 of the A.A.A. provides that "the arbitrator may grant any remedy or relief which is just and equitable and within the terms of the agreement of the parties." No one claims that the award was not within the terms of the agreement of the parties. The only issue before any court hearing a challenge to this arbitration award is whether or not the remedy was "just and equitable" and as to that standard I suggest it is unreviewable absent fraud, corruption or similar wrongdoing.

## VII

### *The Correct Rule*

Arbitration in New Jersey is governed by statute. While our precedents have, I believe, disregarded that statute, it is time we return to it. It pronounces the correct rule. Basically, arbitration awards may be vacated only for fraud, corruption, or similar wrongdoing on the part of the arbitrators. It can be corrected or modified only for very specifically defined mistakes as set forth in section 9. If the arbitrators decide a matter not even submitted to them, that matter can be excluded from the award. For those who think the parties are entitled to a greater share of justice, and that such justice exists only in the care of the court, I would hold that the parties are free to expand the scope of judicial review by providing for such expansion in their contract; that they may, for example, specifically provide that the arbitrators shall render their decision only in conformance with New Jersey law, and that such awards may be reversed either for mere errors of New Jersey law,

substantial errors, or gross errors of New Jersey law and define therein what they mean by that. I doubt if many will. And if they do, they should abandon arbitration and go directly to the law courts.

For the reasons stated in this concurrence, I agree with the plurality's result that the arbitration award should be confirmed.

Judge STEIN joins in this opinion.

STEIN, J., concurring in part and dissenting in part.

As the majority observes, the guiding principles by which we review arbitration awards should serve to enhance the use of arbitration as an alternative forum for the resolution for disputes. *Ante* at 490, 610 *A.*2d at 369. Thus, I concur in the Court's holding that arbitration awards based on mistakes of law should be disturbed only where the arbitrators' error is "gross, unmistakable, undebatable, or in manifest disregard of the applicable law," *ante* at 496, 610 *A.*2d at 373, a standard of review consistent with the common understanding that courts will upset arbitration awards only in the most extreme circumstances. The availability of review, however, even under so restricted a standard, also enhances resort to reliance on arbitration, by protecting those who use arbitration against runaway awards that ignore fundamental legal principles and settled industry practice. In this matter, the arbitrators have ignored a basic and fundamental legal principle and industry practice governing construction contracts: delay damages for unexcused failure to complete a project on time are awarded only to the date of substantial completion. Disregarding that settled principle, the arbitrators' $14,500,000 award included delay damages of over $4,000,000 to compensate for losses incurred after the date of substantial completion. The majority upholds the entire award.

I

In 1983, Perini entered into a contract with Sands pursuant to which Perini would coordinate an extensive renovation project

in exchange for a $600,000 fee. Perini was not engaged as a contractor and did not perform any construction work. The contract specified that the parties would establish a substantial-completion date when they determined the project's maximum cost. The contract also provided that final payment of Perini's fee would be due when the project was either delivered to the owner, ready for occupancy, or actually occupied, provided that the project had been substantially completed. The parties defined substantial completion as

the date when construction is sufficiently complete * * * so the Owner can occupy or utilize the Project or designated portion thereof for the use for which it is intended.

The contract did not refer to a final completion date. Thus, as is common in construction contracts, the parties' bargained-for obligations were linked to the date of substantial completion.

The contract also gave Perini a reasonable time to complete any punch-list work remaining after substantial completion, and provided Sands with a remedy if Perini failed to complete the punch-list or warranty work within a reasonable time. According to Sands, the parties eventually agreed on May 31, 1984, as the date by which Perini was obligated substantially to complete the project, although Perini asserts that "no date for completion had ever been contractually agreed upon."

The renovation consisted of five project components, including the building of a new entrance and the creation of an ornamental glass facade with an elevator on the outside of the building. Because most of the project was complete, or excusably delayed, by May 31st, Sands' delay claim related primarily to damages resulting from Perini's failure timely to complete the new entrance and the facade. According to Sands, it had been depending on the "glitzy" new facade to attract customers from the boardwalk during the busy summer season. Allegedly, the incomplete appearance of the hotel discouraged those potential customers, and Sands claimed losses of approximately $9,000,000 in new business from May 3rd to August 31st.

Sands also sought to collect delay damages of over $4,500,000 for the period between September 15th through December. Sands admitted, however, that the project had been substantially completed by September 15th. For example, Sands' expert testified that the entire project had been substantially completed by that date, and Sands did not contest during the arbitration proceeding that substantial completion had occurred by September 15th. Moreover, although the Chancery Division acknowledged more than once that September 15th was the date of substantial completion, Sands did not object or suggest that a different substantial-completion date might have been contemplated by the arbitrators. Most importantly, in its Appellate Division brief Sands states at least six times that Perini had substantially completed the project by September 15th. For example, Sands asserted, "While it is true, (and Greate Bay has admitted) that substantial completion was achieved by September 15, 1984, this did not preclude Perini from terminating the contract." Sands also stated, "While Perini was able to achieve substantial completion in September 1984, it was still on the site working on unfinished construction as late as December, 1984." Moreover, temporary certificates of occupancy for all phases of the project had been issued by September 14, 1984, a factor that ordinarily indicates substantial completion. *See* 2 Steven G.M. Stein, *Construction Law* ¶ 7.09, at 7–77 (1991) [hereinafter Stein]. Thus, all evidence indicates that Sands viewed September 15th as the date of substantial completion. Only in a supplemental brief to this Court did Sands change its position and argue that "significant evidence [ ] supports a finding that substantial completion did not occur until long after September 15."

After September 15th, Perini continued the work necessary to finish the project completely. For example, steps leading to the casino had been constructed improperly and had to be repoured pursuant to the warranty provision in the contract. The steps were repoured in sections, however, and one of Sands' witnesses explained that there was "actual foot traffic

through that area during the entire time." Perini also continued the punch-list work, including work on the glass elevator.

According to Sands, it was entitled to delay damages after September 15th, the date of substantial completion, because the loss of business caused by the delay during the summer had carried over to the fall months, causing Sands to lose an additional $4,580,000. Sands also argued that punch-list and warranty work that Perini had continued to perform after September 15th had caused it inconvenience and had given the hotel an unfinished appearance, forcing Sands to spend extra money on promotions and causing additional lost profits.

## II

The majority opinion presents a thorough and well-reasoned explanation of the law of substantial completion. As the majority notes, "substantial completion has definite meaning in the construction industry." *Ante* at 500, 610 *A.*2d at 375. Generally, as in this case, parties and courts define substantial completion as the date on which construction is sufficiently complete to enable the owner to occupy or use the project for its intended purpose. Because liquidated or delay damages are designed to approximate an owner's loss *before* occupancy, awarding those damages for a period after substantial completion serves to penalize the breaching party and would thus be contrary to the fundamental principles of contract law. *See* Stein, *supra,* at ¶ 6.07[3] at 8–18. Thus, courts have consistently recognized that delay or liquidated damages may not be awarded after substantial completion. *See Monsen Eng'g Co. v. Tami–Githens, Inc.,* 219 *N.J.Super.* 241, 244, 250–51, 530 *A.*2d 313 (App. Div.1987); *Utica Mut. Ins. Co. v. DiDonato,* 187 *N.J.Super.* 30, 453 *A.*2d 559 (App.Div.1982); *Public Health Trust v. Romart Constr., Inc.,* 577 *So.*2d 636, 637 (Fla.Dist.Ct.App.1991); *Stone v. City of Arcola,* 181 *Ill.App.*3d 513, 130 *Ill.Dec.* 118, 128, 536 *N.E.*2d 1329, 1338 (Ill.App.Ct.1989); *American Druggists Ins. Co. v. Henry Contracting, Inc.,* 505 *So.*2d 734, 738–39 (La.Ct.

App.), *cert. denied,* 511 *So.*2d 1156 (1987); *Hemenway Co. v. Bartex, Inc.,* 373 *So.*2d 1356, 1358 (La.Ct.App.), *cert. denied,* 376 *So.*2d 1272 (1979); *Page v. Travis–Williamson County Water Control,* 367 *S.W.*2d 307, 311 (Tex.1963); *Brower Co. v. Garrison,* 2 *Wash.App.* 424, 468 *P.*2d 469, 476–77 (1970). Accordingly, as the majority acknowledges, "Perini's argument that delay damages cannot be awarded after substantial completion of the contract is amply supported by the case law and construction-industry practice." *Ante* at 505, 610 *A.*2d at 377. As the majority concedes, the accepted measure of damages after substantial completion is merely the amount necessary to bring the project to full completion. *Ante* at 502, 610 *A.*2d at 376; *Van Dusen Aircraft Supplies, Inc. v. Terminal Constr. Corp.,* 3 *N.J.* 321, 329, 70 *A.*2d 65 (1949); *Feeney v. Bardsley,* 66 *N.J.L.* 239, 240, 49 *A.* 443 (E. & A. 1901); 6 *Williston on Contracts* § 842 (3d ed. 1962).

### III

Because the law and industry practice concerning delay damages is so well-settled and firmly established, parties to a contract ordinarily would not contemplate the possibility of an assessment of delay damages after substantial completion. One can infer that owners and contractors rely on that established principle in negotiating construction contracts. A contractor submitting a bid on a construction contract would understandably calculate its profit margin, and select its subcontractors, on the assumption that its exposure for delay or liquidated damages could not extend beyond the substantial-completion date. An owner seeking the option of collecting delay damages after substantial completion of a project would not only have to bargain for that right during negotiations but presumably would expect to pay a premium for that option, in the form of a higher contract price.

Although the construction industry relies on the well-settled law of substantial completion, the majority bases its decision in part on a finding that the language of the contract "does not

suggest [ ] that Sands fully conceded either that an award of consequential damages was precluded after September 15, 1984, or that it intended to give the expression, substantial completion, its construction-industry 'term of art' meaning." *Ante* at 506, 610 *A*.2d at 378. That analysis suggests that when parties do not explicitly recite their intention to be bound by applicable law, arbitrators are not bound to follow the law. That theory directly contradicts the settled rule that *"[u]nless the parties provide otherwise,* it is also presumed that they intended that their dispute be resolved in accordance with the law." *Communications Workers v. Monmouth County Bd. of Social Servs.,* 96 *N.J.* 442, 450, 476 *A*.2d 777 (1984) (emphasis added); *accord In re Arbitration Between Grover & Universal Underwriters Ins. Co.,* 80 *N.J.* 221, 230–31, 403 *A*.2d 448 (1979). Here, the parties agreed that the contract would be governed by New Jersey law, and Sands concedes that it intended that the dispute be governed by applicable legal principles. See *ante* at 493, 610 *A*.2d at 371. The arbitrators, therefore, were bound to honor the parties' intentions by interpreting their contract in accordance with the law. *See Kearny P.B.A. Local #21 v. Town of Kearny,* 81 *N.J.* 208, 217, 405 *A*.2d 393 (1979). Thus, the arbitrators' award of delay damages after the date of substantial completion violated not only established law but the apparent intentions of the parties at the time of contracting.

The majority also explains that an arbitration award is not reviewable on grounds of mistake of law if the arbitrators' interpretation of that law is "reasonably debatable." *Ante* at 493, 610 *A*.2d at 371. The majority then concludes that the arbitrators' failure to apply the law and settled practice limiting delay damages to the period prior to substantial completion might have been reasonable on this record. Specifically, the majority notes that there was evidence to suggest that Perini's work after substantial completion "greatly detracted from the building's appearance, prevented customer access, disrupted operations, and contributed to Sands's loss of business." *Ante* at 507, 610 *A*.2d at 378. However, that ongoing work was

punch-list and warranty work, work that Perini had a right under the contract to complete within a reasonable time after substantial completion. To assess delay damages against Perini for adhering to its contractual obligation to complete punch-list and warranty work would be unthinkable. Moreover, Sands had a bargained-for remedy under the contract for punch-list work and warranty work that was not completed within a reasonable time.

The majority also observes that Perini's delay in completing the facade allegedly discouraged potential patrons from patronizing the casino and that the arbitrators might have assumed that the lost patronage continued after the date of substantial completion. *Ante* at 508, 610 *A.*2d at 379. That assumption notwithstanding, the award of delay damages beyond the date of substantial completion, even if such damages had been sustained, is simply impermissible.

Because the principle limiting delay damages to the period up to substantial completion is so firmly embedded in the law and in construction-industry practice, Sands must have known that delay damages would not be available after that date. If Sands had wanted to protect itself from possible losses arising after the substantial-completion date but attributable to a delay in substantial completion, it should have bargained for that right. The Court should not allow the arbitrators to disregard established law and industry practice in awarding delay damages unauthorized by the contract and not contemplated or bargained for by the parties.

IV

The majority upholds an arbitration award requiring Perini to pay over $14,500,000 for breach of a contract under which it was to receive $600,000. Over $4,000,000 of that award is comprised of delay damages that accrued after the date of substantial completion. Because the case law and construction-industry practice do not permit the award of delay damages for periods after substantial completion, the arbitrators committed

an egregious error of law. The reliability of arbitration as an alternative method of dispute resolution mandates judicial intervention in extreme cases such as this in which a settled legal principle and industry practice have been repudiated by the arbitrators' award. Accordingly, I dissent from the majority opinion to the extent that it upholds the imposition of delay damages after the date of substantial completion.

Justice HANDLER joins in this opinion.

Chief Justice WILENTZ and Judge A.M. STEIN, concur in result.

*For affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD and O'HERN and Judges A.M. STEIN and KEEFE—5.

Justices HANDLER and STEIN, concur in part and dissent in part—2.